**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**DELTROIT DIRECTIONAL OPPORTUNITIES MASTER FUND LIMITED, ALGEBRIS UCITS FUNDS P.L.C., FINECO ASSET MANAGEMENT DAC, CQS CREDIT MULTI ASSET FUND, CQS BRUNEL MULTI ASSET CREDIT FUND, CQS ALTERNATIVE CREDIT FUND, CQS NEW CITY HIGH YIELD FUND LIMITED, MERCER MULTI-ASSET CREDIT FUND,** and **FAROS POINT CREDIT OPPORTUNITIES LIMITED,**

Plaintiffs,

v.

**SELECTA GROUP B.V., SELECTA GROUP AG IN LIQUIDATION, SELECTA AG, SELECTA HOLDING SAS, SELECTA SAS, SELECTA NORDIC HOLDING AB, SELECTA AB, SELECTA UK HOLDING LIMITED, SELECTA U.K. LIMITED, SELECTA FINANCE UK LIMITED, PELICAN ROUGE COFFEE ROASTERS, B.V., SELECTA BELGIUM NV, AB SERVICIOS SELECTA ESPANA S.L.U., SELECTA ITALIA S.P.A., INVESCO CREDIT PARTNERS MASTER FUND III, LP, INVESCO CREDIT PARTNERS MASTER FUND II, LP, INVESCO CREDIT PARTNERS OPPORTUNITIES FUND 2020, L.P., INVESCO FLOATING RATE ESG FUND, INVESCO SENIOR FLOATING RATE FUND, INVESCO ZODIAC FUNDS - INVESCO US SENIOR LOAN FUND, INVESCO CREDIT PARTNERS OPPORTUNITIES FUND 2023, L.P., INVESCO ZODIAC FUNDS - INVESCO EUROPEAN SENIOR LOAN FUND, INVESCO SENIOR INCOME TRUST, INVESCO SENIOR LOAN FUND, INVESCO DYNAMIC CREDIT OPPORTUNITY FUND, MAN FUNDS VI PLC - MAN HIGH YIELD**

CIVIL ACTION NO. 1:25-cv-08956-LAK

**<u>FIRST AMENDED COMPLAINT</u>**

JURY TRIAL DEMANDED

**OPPORTUNITIES, ST JAMES'S PLACE DIVERSIFIED BOND UNIT TRUST, MAN FIXED INTEREST ICVC - MAN HIGH YIELD OPPORTUNITIES FUND, MEDIOLANUM STRATEGIA EURO HIGH YIELD, MAN FUNDS XII SPC - MAN 1783 II SP, MAN GLG GLOBAL CREDIT OPPORTUNITIES, MAN GLG CREDIT OPPORTUNITIES DRAWDOWN 1 LP, MAN FUNDS VI PLC - MAN EUROPEAN HIGH YIELD OPPORTUNITIES, MAN MULTI-STRATEGY MASTER FUND, MAN FUNDS VI PLC - MAN CREDIT OPPORTUNITIES ALTERNATIVE, MAN INTERNATIONAL ICVC - MAN DYNAMIC ALLOCATION FUND, MAN DIVERSIFIED CREDIT MASTER SPC – MAN DIVERSIFIED CREDIT SP I, BI ASSET MANAGEMENT FONDSMAEGLERSELSKAB A/S - VIRKSOMHEDSOBLIGATIONER HY KL, STRATEGIC VALUE PARTNERS LLC, DCP TREE LP, DIAMETER MASTER FUND LP, DIAMETER DISLOCATION MASTER FUND II LP, NICOLE CHARRIERE, RUUD GABRIELS, ROBERT PLOOIJ, BOB RAJAN, JASON CLARKE** and **JOHN DOES 1-10,**

Defendants.

Plaintiffs Deltroit Directional Opportunities Master Fund Limited ("Deltroit"); Algebris UCITS Funds P.L.C. in respect of its sub-fund Algebris Global Credit Opportunities Fund ("Algebris UCITS"); Fineco Asset Management DAC on behalf of CoRe Series – Global Macro Credit FAM Fund ("Fineco," and together with Algebris UCITS, "Algebris"); CQS Credit Multi Asset Fund ("CQS Credit Multi"); CQS Brunel Multi Asset Credit Fund ("CQS Brunel Multi"); CQS Alternative Credit Fund ("CQS Alternative"); CQS New City High Yield Fund Limited ("CQS New City"); Mercer Multi-Asset Credit Fund ("Mercer," and together with CQS Credit

Multi, CQS Brunel Multi, CQS Alternative, and CQS New City, "CQS"); Faros Point Credit Opportunities Limited ("Faros Point," and together with CQS, Deltroit and Algebris, "Plaintiffs"), by and through their undersigned counsel, Faegre Drinker Biddle & Reath LLP, submit the following Complaint against the above-captioned Defendants. Plaintiffs allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Plaintiffs—each of whom holds interests in the first lien notes[1] ("1L Holders") of Defendant Selecta Group B.V. ("Selecta Group B.V.")—bring this action for compensatory damages, statutory treble damages, attorneys' fees, costs, and interest based on a concerted, anticompetitive, and clandestine scheme carried out by Selecta Group B.V., its affiliates, and a closed group of its noteholders (each a "Favored Holder" and together the "Favored Holders") to subordinate Plaintiffs' notes below those held by equally ranked noteholders, strip Plaintiffs of protections owed to them under the governing trust indenture, and give the Favored Holders exclusive control of Selecta Group B.V. and its assets. In carrying out their scheme, Selecta Group B.V., Selecta Group AG, and the Favored Holders violated both federal and state antitrust laws and multiple provisions of the governing 1L Indenture and related agreements for Plaintiffs' notes.

2. Defendants effectuated their scheme through a series of transactions (the "Restructuring") executed from April to July 2025, pursuant to, on information and belief, an

[1] Selecta Group B.V. issued the 1L notes (the "1L Notes") pursuant to an indenture dated October 29, 2020 (as amended or supplemented from time to time, the "1L Indenture") by and between Selecta Group B.V. (as Issuer), the Guarantors (as defined in the IL Indenture), Kroll Trustee Services Limited (f/k/a Lucid Trustee Services Limited) ("Kroll"), as Trustee and Security Agent, and Elavon Financial Services DAC, as Paying Agent, Transfer Agent, and Registrar. A copy of the 1L Indenture is attached hereto as Exhibit A.

agreement between Selecta Group B.V. and the Favored Holders (the "Framework Agreement")[2] and among the Favored Holders themselves (the "Cooperation Agreement"). The full terms of the Framework and Cooperation Agreements have never been disclosed publicly.[3] Upon information and belief, the Favored Holders have refused to allow other 1L Holders (the "Excluded Holders") to join their group, thereby allowing the Favored Holders to expropriate nearly all the economic value in Selecta Group B.V. and its affiliates at the expense of other, equally ranked 1L Holders (including Plaintiffs).

3. To implement the Restructuring scheme, the Favored Holders first initiated a foreclosure with respect to the shares used as collateral for Plaintiffs' 1L Notes. The foreclosure resulted in the transfer of those shares to a new company organized and ultimately controlled by the Favored Holders, Seagull Bidco Limited ("Bidco"). Defendants effectuated this step through an ordinary foreclosure proceeding in the courts of the Netherlands[4] initiated by Kroll, in its capacity as Security Agent under the Intercreditor Agreement (described and defined in detail below).[5] Upon information and belief, Defendants instructed Kroll to delay or otherwise provide

---

[2] Upon information and belief, Selecta Group B.V, Bidco, Selecta Group AG, and consenting creditors (upon information and belief, the Favored Holders) entered into a Framework Agreement dated April 9, 2025. Offering and Exchange Offer Memorandum, dated June 17, 2025, attached hereto as Exhibit B (the "Exchange Memorandum") at 330, 1130. There was also, upon information and belief, a Share Purchase Agreement negotiated between the Security Agent (defined below) and Bidco. Dutch Decision (defined below) ¶ 2.10.

[3] *Selecta Group Secures Transformative Recapitalization Agreement*, SELECTA GROUP B.V. (Apr. 30, 2025), https://www.selecta.com/int/en/selecta-group/newsroom/selecta-group-transformative-recapitalisation-agreement.

[4] On May 13, 2025, the Netherlands Commercial Court issued its decision in the matter (the "Dutch Decision"). A copy of the Dutch Decision is attached hereto as Exhibit C.

[5] On January 31, 2018, two years before the issuance of the 1L Notes, Selecta Group B.V., its affiliates, and the trustees and representatives appointed to its various groups of lenders executed an Intercreditor Agreement (the "Intercreditor Agreement"). The Intercreditor Agreement governs the interrelationship, rights, and obligations of various levels of Selecta Group's debt and the security interests relating thereto. A copy of the Intercreditor Agreement is

inadequate notice regarding the proceeding, and to make material misrepresentations and omissions to the Dutch court, which Kroll acceded to do. No Excluded Holders participated in the Dutch proceeding. Indeed, the only party that did participate was Kroll, which specifically asked the Dutch court ***not*** to hold a public hearing. To date, representatives of Kroll, Selecta Group B.V., and Bidco have refused to disclose the information and filings they submitted to the Dutch court.

4. After Selecta Group B.V.'s equity was transferred to Bidco—thereby giving Bidco, and thus the Favored Holders, control of Selecta Group B.V.'s assets—Defendants forcibly replaced Plaintiffs' 1L Notes from Selecta Group B.V. with third out notes ("3O Notes") issued by Bidco.[6] Upon information and belief, the 3O Notes given to Plaintiffs were "out of the money" from the outset because Bidco was intentionally under-capitalized and was never solvent.

5. The next step of the Restructuring consisted of a purported exchange offer.[7] Plaintiffs, now holding 3O Notes—the value of which was minimal at best—were offered the "option" to exchange those 3O Notes for ***first*** out notes ("1O Notes") issued by Bidco, but ***only*** if Plaintiffs would agree to release any claims they may have related to the Restructuring and give up critical protections they enjoyed under both the Selecta Group B.V. 1L Indenture and the Bidco

attached hereto as Exhibit D. The 1L Indenture makes specific reference to the Intercreditor Agreement, which by its terms authorizes a "Security Agent" (which was Kroll at the time of the Restructuring) to take various actions in the event there is an enforcement of the 1L Holders' security interests.

6 The 3O Notes are governed by an Indenture dated June 11, 2025 (the "3O Indenture"), a copy of which is attached hereto as Exhibit E.

7 The Favored Holders exchanged their 3O Notes for 1O Notes through a private exchange on June 12, 2025, ahead of the exchange offer open to the Excluded Holders. Exchange Memorandum at 8.

3O Indenture.[8] In particular, under the terms of the 1O Indenture, the Favored Holders had the ability during the 12 months immediately following the exchange to alter key financial (or "sacred") terms of the 1O Indenture without obtaining the consent of 90% of the outstanding holders—a requirement for such changes included in both the 1L Indenture and the 3O Indenture. As admitted by Bidco in its Exchange Memorandum, because the Favored Holders control more than 50% of Bidco's 1O Notes, the removal of the 90% consent requirement from the 1O Indenture gives the Favored Holders the ability to, among other things: (i) change the economic terms of the 1O Notes (e.g., eliminating the holders' right to principal or interest); (ii) exchange their (but not the Excluded Holders') 1O Notes for new, more senior securities; or (iii) pay themselves (but not the Excluded Holders) for consenting to either of the above transactions. Upon information and belief, Kroll, in its capacity as Trustee of the 1L Indenture, Security Agent under the Intercreditor Agreement, Trustee of the 3O Indenture, and Trustee of the 1O Indenture, necessarily would have understood that the Restructuring would result in the Excluded Holders receiving securities with far less protections than those they originally had under the IL Indenture.

6. Upon information and belief, Defendants included the above conditions to the exchange offer in a deliberate attempt to discourage the Excluded Holders from trading up to 1O Notes, thereby subordinating a substantial number of 1L Holders with whom the Favored Holders previously had to share their first lien rights. Although the Excluded Holders' 3O Notes were likely worthless, the risks of trading them for 1O Notes—that are currently "in the money" but the value of which may be impaired or destroyed if the Favored Holders so choose—was simply too great, not least because the exchange offer was conditional on agreeing to a series of wide-ranging

[8] Upon information and belief, the 1O Notes are governed by an Indenture dated June 11, 2025 (the "<u>1O Indenture</u>"), a copy of which is attached to the Exchange Memorandum. Exchange Memorandum at 307.

releases and other provisions which would have prevented the Excluded Holders from objecting to the Restructuring. In the end, only 40% of the Excluded Holders opted to exchange their 3O Notes for 1O Notes.

7. Upon information and belief, in order to thwart any attempt by Plaintiffs and other 1L Holders to block their plan, Defendants intentionally concealed the key terms of their scheme and delayed whatever disclosures they did make in bad faith. By way of example, Defendants waited until ***after*** the Dutch court had approved the share sale to reveal that the 1L Holders would receive virtually worthless 3O Notes in exchange for their 1L Notes, and that the only way Plaintiffs could reverse their subordination was by giving up their sacred rights and waiving their claims against Defendants based on the Restructuring. ***None*** of the notices Kroll or Selecta Group B.V. provided to Plaintiffs regarding the Restructuring or the Dutch proceeding said ***anything*** about the foregoing.[9] Upon information and belief, Kroll (acting at the direction of the Favored Holders) withheld facts from both the Excluded Holders and the Dutch court in an attempt to conceal the fact that the Restructuring would severely prejudice the Excluded Holders' rights. As a result of the foregoing, the Excluded Holders first learned that the Restructuring had effectively 'robbed' them of millions in value weeks after the Dutch court issued its decision.

8. The other tool Defendants used to effectuate their scheme was the Favored Holders' Cooperation Agreement.[10] In addition to preventing other 1L Holders from joining their group, the Favored Holders included terms in the Cooperation Agreement specifically prohibiting all

---

[9] Upon information and belief, Kroll provided notice to the 1L Holders through statements delivered by Euroclear and/or Clearstream, the two securities clearing agents who nominally hold the notes on behalf of the "beneficial holders" (i.e., Plaintiffs and the other 1L Holders).

[10] Attached hereto as Exhibit F is what Plaintiffs understand to be an unexecuted copy of the Cooperation Agreement.

parties to the contract from supporting any alternative restructuring transaction that would benefit the Excluded Holders. Cooperation Agreement at 10(A)(i). By contractually requiring their group to vote as a block to the exclusion and disadvantage of the Excluded Holders, the Favored Holders ensured their ability (as holders of the majority of the 1O Notes and the shares of Bidco's ultimate parent company) to funnel all the value of Selecta Group B.V.'s assets to themselves.

9. The Exchange Memorandum issued in connection with the exchange offer shows that Defendants (and, upon information and belief, Kroll) were well aware that the Restructuring harmed the Excluded Holders. Indeed, in the risk factors section of the Exchange Memorandum, Bidco acknowledged that creditors might challenge the Restructuring as violating the governing credit instruments (including the 1L Indenture) and that their challenge might succeed. Exchange Memorandum at 83–84. The memorandum also admits that the Favored Holders negotiated an indemnity from Bidco for any claims arising from the Restructuring.[11] Exchange Memorandum at 90.

10. Although Defendants continue to conceal key details regarding the Restructuring, the negative and anticompetitive impact on Plaintiffs and other Excluded Holders is very clear. Before the Restructuring, Plaintiffs were in a first lien position in Selecta Group B.V.'s capital structure, had perfected security interests in all of Selecta Group B.V.'s equity (which they held pari passu with the Favored Holders), and had guarantees from no fewer than twelve of Selecta Group B.V.'s affiliates. As a result of the Restructuring scheme, Plaintiffs now hold the 3O Notes, securities with little prospect of any recovery, and were denied the ability to trade up to 1O Notes without giving up protections critical to safeguarding their investment. Tellingly, while the 1O

---

[11] It is not clear at this time how Kroll justified taking actions it knew (or should have known) would harm Plaintiffs and other 1L Holders who were not part of the Favored Holders group—parties whose interests Kroll was obliged to safeguard.

Notes held by the Favored Holders are trading on the secondary markets at approximately 75 cents on the euro, both the 3O Notes held by Plaintiffs ***and*** the 1O Notes held by Excluded Holders who accepted Bidco's exchange offer are trading for approximately 15-20 cents on the euro.

11. The stark divide between the fortunes of the Favored Holders and Excluded Holders has attracted significant criticism in the press and amongst capital markets participants. Describing the Restructuring as both "coercive" and "invidious," numerous industry publications and commentators have called out the Favored Holders for hiding the details of their negotiations, preventing other 1L Holders from joining their group, and forcing the Excluded Holders to choose between near worthless 3O Notes or the elimination of their sacred rights. Taken together, these steps constitute a striking (and disturbing) example of "creditor-on-creditor violence."

12. In executing the Restructuring, Defendants violated multiple provisions of U.S. antitrust law. The Cooperation Agreement is a classic example of an anticompetitive and collusive agreement between competitors (here, Selecta Group B.V.'s 1L Holders) to control the price for Selecta Group B.V.'s first lien debt and to exclude Plaintiffs from the market for anticompetitive purposes. Absent the Cooperation Agreement, the Favored Holders would have been unable to execute the Restructuring in the manner accomplished, the main objective of which was to artificially increase the value of the Favored Holders' notes by impairing the value of the notes held by the Excluded Holders. As noted above, the Cooperation Agreement prohibits participating holders from supporting any restructuring that would not benefit the Favored Holders or would offer "advantageous treatment" to Excluded Holders. By using the Cooperation Agreement to

enhance their own market position at the expense of other market participants, the Favored Holders violated Section 1 of the Sherman Act and parallel provisions of New York State's Donnelly Act.

13. Defendants' conduct also resulted in multiple violations of the 1L Indenture and other agreements governing Plaintiffs' 1L Notes. As a result of the Restructuring, Plaintiffs and other 1L Holders were never paid the principal and interest they were owed under the 1L Indenture, and instead received replacement notes (which were not contemplated by the 1L Indenture). Worse yet, the "foreclosure" orchestrated by the Defendants resulted in Plaintiffs receiving notes of significantly inferior value to those received by Favored Holders. By failing to pay Plaintiffs what they were owed under the 1L Indenture (i.e., the principal and interest owed on the notes, or a "ratable" recovery from the sale of the relevant collateral), Selecta Group B.V. violated the terms of the 1L Indenture as well as provisions of other, related agreements. Nothing in the agreements governing Plaintiffs' 1L Notes and nothing in the Dutch proceeding that resulted in the transfer of the collateral for those 1L Notes to Bidco permitted this result.

14. Based upon the foregoing, Plaintiffs are entitled to: (i) money damages in an amount to be determined at trial, of no less than an amount equal to the principal of and accrued and unpaid interest on their original notes plus pre- and post-judgment interest, (ii) statutory treble damages, (iii) reasonable expenses and attorneys' fees, and (iv) interest as permitted under the 1L Indenture and applicable antitrust laws.

## THE PARTIES

15. Plaintiff Deltroit Directional Opportunities Master Fund Limited is a company with limited liability under the laws of the Cayman Islands, established in George Town, Cayman Islands, with registered office at (KY1-1104) George Town at PO Box 309, Ugland House, registered under company number MC-149859, and holding office in (SW1Y 5JH) London,

England at the 1st Floor 50 Pall Mall. Deltroit is the beneficial owner of approximately €23 million of the 1L Notes.

16. Plaintiff Algebris UCITS Funds P.L.C. is a public limited company incorporated in Ireland, with company number 452760 with its registered office at 33 Sir John Rogerson's Quay, Dublin 2, Ireland. Algebris UCITS, in respect of its sub-fund Algebris Global Credit Opportunities Fund, is the beneficial owner of approximately €16.8 million of the 1L Notes.

17. Plaintiff Fineco Asset Management DAC is a designated activity company incorporated in Ireland with company number 614136 with its registered office at 6th Floor, Block A, Georges Quay, Dublin, Ireland, acting solely as management company for and on behalf of CoRe Series – Global Macro Credit FAM Fund. Fineco, through CoRe Series – Global Macro Credit FAM Fund, is the beneficial owner of approximately €4.2 million of the 1L Notes.

18. Plaintiffs CQS Credit Multi Asset Fund, CQS Brunel Multi Asset Credit Fund, and CQS Alternative Credit Fund are authorized sub-funds of CQS Global Funds (Ireland) P.L.C., which is a private limited company incorporated in Ireland with company number 469465 with its registered office at Block A, Capital Dock, 79 Sir John Rogerson's Quay Dublin 2, Dublin 2, Ireland. CQS Global Funds (Ireland) P.L.C., in respect of its sub-funds CQS Credit Multi Asset Fund, CQS Brunel Multi Asset Credit Fund, and CQS Alternative Credit Fund, is the beneficial owner, in aggregate, of approximately €17,408,894 of the 1L Notes.

19. Plaintiff CQS New City High Yield Fund Limited is a public limited company incorporated in Jersey with company number 95691 with its registered office at IFC 1, The Esplanade, St. Helier, Jersey. CQS New City is the beneficial owner of approximately €4,874,095 of the 1L Notes.

20. Plaintiff Mercer Multi-Asset Credit Fund is an authorized sub-fund of Mercer QIF Fund P.L.C., which is a private limited company incorporated in Ireland with company number 452760 with its registered office at 6th Floor, 2 Grand Canal Square, Dublin 2, Ireland. Mercer QIF Fund P.L.C., in respect of its sub-fund Mercer Multi-Asst Credit Fund, is the beneficial owner of approximately €1,040,268 of the 1L Notes.

21. Plaintiff Faros Point Credit Opportunities Limited is a sub-fund of FAROS POINT CREDIT OPPORTUNITIES FUND ICAV (an umbrella Irish Collective Asset-management Vehicle with segregated liability between its Funds registered in Ireland and authorized as a Qualifying Investor Alternative Investment Fund pursuant to the AIF Rulebook) with its registered address at Fifth Floor, 76 Sir John Rogerson's Quay, Dublin Docklands, Dublin 2, D02 C9D0. Faros Point is the assignee of rights of approximately €1,615,003 of the 1L Notes.

22. Defendant Selecta Group B.V. is a private limited company (*besloten vennootschap*) under Dutch law, established in Amsterdam, The Netherlands, having its registered office at Hoofddorp, Spicalaan 39.

23. Defendant Selecta Group AG in liquidation ("Selecta Group AG," and together with Selecta Group B.V. and all affiliates, "Selecta Group") is a public limited company (*Aktiengesellschaft*) organized under the laws of Switzerland, with its registered address at Alte Steinhauserstrasse 14, 6330 Cham, Switzerland. Upon information and belief, prior to the Restructuring, Selecta Group AG held the outstanding shares of Selecta Group B.V.

24. Defendant Selecta AG (formerly named Selecta TMP AG, "Selecta AG") is a corporation (*aktiengesellschaft*) organized under the laws of Switzerland with its registered address at Alte Steinhauserstrasse 14, 6330 Cham, Switzerland.

25. Defendant Selecta Holding SAS ("Holding SAS") is a simplified joint stock company (*société par actions simplifiée*) organized under the laws of France with its head office at 53 Boulevard Ornano Pleyad Cs 60042, 93200 Saint-Denis, France.

26. Defendant Selecta SAS ("SAS") is a simplified joint stock company (*société par actions simplifiée*) organized under the laws of France with its head office at Pleyad 3 53 Boulevard Ornano, 93200 Saint-Denis, France.

27. Defendant Selecta Nordic Holding AB ("Selecta Nordic") is a limited company (*aktiebolag*) organized under the laws of Sweden with its registered address at c/o Selecta AB, Torggatan 15, 171 54 Solna, Sweden.

28. Defendant Selecta AB ("Selecta AB") is a limited company (*aktiebolag*) organized under the laws of Sweden with its registered address at Torggatan 15, 17154 Solna, 171 54 Solna, Sweden.

29. Defendant Selecta UK Holding Limited ("UK Holding") is a private limited company organized under the laws of England and Wales with its registered office address at 1 Finway Road Finway Road, Hemel Hempstead Industrial Estate, Hemel Hempstead, Hertfordshire, England, HP2 7PT.

30. Defendant Selecta U.K. Limited ("U.K. Limited") is a private limited company organized under the laws of England and Wales with its registered office address at 1 Finway Road Finway Road, Hemel Hempstead Industrial Estate, Hemel Hempstead, Hertfordshire, England, HP2 7PT.

31. Defendant Selecta Finance UK Limited ("Selecta Finance") is a private limited company organized under the laws of England and Wales with its registered office address at 1

Finway Road Finway Road, Hemel Hempstead Industrial Estate, Hemel Hempstead, Hertfordshire, England, HP2 7PT.

32. Defendant Pelican Rouge Coffee Roasters, B.V. ("Pelican Rouge") is a private limited company (*besloten vennootschap*) organized under the laws of The Netherlands with its registered address at Dordecht, Leeghwaterstraat 6, The Netherlands.

33. Defendant Selecta Belgium NV ("Selecta Belgium") is a public limited company (*naamloze vennootschap*) organized under the laws of Belgium with its registered address at Industrieweg 10a, 2850 Boom, Belgium.

34. Defendant AB Servicios Selecta Espana S.L.U. ("AB Servicios") is a private limited liability company (*sociedad limitada*) organized under the laws of Spain registered in the Commercial Registry of Madrid at page M-207189, volume 12881 and sheet 52, having its corporate address at Avenida Constitucion 210-212 Torrejón de Ardoz 28850 (Madrid).

35. Defendant Selecta Italia S.p.A. (formerly named Gruppo Argenta S.p.A.) ("Selecta Italia," and together with Selecta AG, Holding SAS, SAS, Selecta Nordic, Selecta AB, UK Holding, U.K. Limited, Selecta Finance, Pelican Rouge, Selecta Belgium, and AB Servicios, the "Guarantors" and each a "Guarantor") is a joint stock company (*società per azioni*) organized under the laws of Italy with its registered address at Reggio Emilia (Re) Via Manfredo Fanti 2 cap 42124.

36. Upon information and belief, Defendants Invesco Credit Partners Master Fund III, LP, Invesco Credit Partners Master Fund II, LP, Invesco Credit Partners Opportunities Fund 2020, L.P., Invesco Floating Rate ESG Fund, Invesco Senior Floating Rate Fund, Invesco Zodiac Funds - Invesco US Senior Loan Fund, Invesco Credit Partners Opportunities Fund 2023, L.P., Invesco Zodiac Funds - Invesco European Senior Loan Fund, Invesco Senior Income Trust, Invesco Senior

Loan Fund, and Invesco Dynamic Credit Opportunity Fund (the "Invesco Defendants") are affiliates of, managed by, or otherwise related to Invesco Ltd., with its principal place of business at 1331 Spring Street NW, Suite 2500, Atlanta, GA 30309. Upon information and belief, the Invesco Defendants each participated in the Restructuring as a Favored Holder.

37. Upon information and belief, Defendants Man Funds VI plc - Man High Yield Opportunities, St James's Place Diversified Bond Unit Trust, Man Fixed Interest ICVC - Man High Yield Opportunities Fund, Mediolanum Strategia Euro High Yield, Man Funds XII SPC - Man 1783 II SP, Man GLG Global Credit Opportunities, Man GLG Credit Opportunities Drawdown 1 LP, Man Funds VI plc - Man European High Yield Opportunities, Man Multi-Strategy Master Fund, Man Funds VI plc - Man Credit Opportunities Alternative, Man International ICVC - Man Dynamic Allocation Fund, Man Diversified Credit Master SPC – Man Diversified Credit SP I, and BI Asset Management Fondsmaeglerselskab A/S - Virksomhedsobligationer HY KL (the "Man Group Defendants") are affiliates of, managed by, or otherwise related to Man Group, PLC, a public limited company incorporated under the laws of Jersey having its registered office at 22 Grenville Street, St. Helier, JE4 8PX, Jersey, its head office at 2 Swan Lane, London, EC4R 3AD, United Kingdom, and an office at 1345 Avenue of the Americas, 21st Floor, New York, NY 10105. Upon information and belief, the Man Group Defendants each participated in the Restructuring as a Favored Holder.

38. Upon information and belief, Defendant Strategic Value Partners, LLC ("SVP") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 100 West Putnam Avenue, Greenwich, CT 06830, and an office at 375 Park Avenue, 27th Floor, New York, NY 10152. Upon information and belief, SVP participated in the Restructuring as a Favored Holder.

39. Upon information and belief, Defendants DCP Tree LP, Diameter Master Fund LP, and Diameter Dislocation Master Fund II LP (the "Diameter Defendants") are affiliates of, managed by, or otherwise related to Diameter Capital Partners LP, an alternative asset manager organized as a limited partnership under the laws of the State of Delaware with its principal place of business at 55 Hudson Yards, New York, NY 10001. Upon information and belief, the Diameter Defendants participated in the Restructuring as a Favored Holder.

40. Defendants Nicole Charriere, Ruud Gabriels, Robert Plooij, Bob Rajan, and Jason Clarke (each a "Selecta Group B.V. Director" and collectively, the "Selecta Group B.V. Directors"), upon information and belief, were the directors of Selecta Group B.V. at the time of the Restructuring and, upon information and belief, participated in facilitating the Restructuring. Upon information and belief, at least some of the Selecta Group B.V. Directors also facilitated and/or approved the issuance of the 1L Notes.

41. Defendants John Does 1-10 are the other Favored Holders unknown to Plaintiffs who entered into the Cooperation Agreement and participated in the Restructuring.

## JURISDICTION AND VENUE

42. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367, as well as under Section 4 of the Clayton Act, 15 U.S.C. § 15, and Section 4 of the Sherman Act, 15 U.S.C. § 4. This Court has jurisdiction over Counts I-II because those Counts arise under federal law. This Court has supplemental jurisdiction over Counts III-X because those Counts involve claims so related to Plaintiffs' federal claims that they form part of the same case or controversy and/or include a common nucleus of operative facts.

43. This Court has personal jurisdiction over Selecta Group AG, Selecta Group B.V., and the Guarantors because the 1L Indenture governing the 1L Notes at issue contains both a

choice-of-law provision selecting New York law as the governing law and a forum-selection clause selecting the federal or state courts located in the State and City of New York. 1L Indenture § 14.05 (Agent for Service; Submission to Jurisdiction; Waiver of Immunities), 1L Indenture § 14.07 (Governing Law). Selecta Group AG is listed as a Pledgor on Schedule A of the 1L Indenture, and thus is bound by the 1L Indenture's choice of law and venue provisions. Selecta Group B.V., Selecta Group AG, and the Guarantors have irrevocably consented to the Court's personal jurisdiction pursuant to Sections 14.05 and 14.07 of the 1L Indenture.

44. This Court has personal jurisdiction over the Invesco Defendants, the Man Group Defendants, SVP, the Diameter Defendants, and the John Does 1-10 (as defined above, the Favored Holders) as they have consented to the Court's personal jurisdiction pursuant to paragraph 24 of the Cooperation Agreement and Section 14.05 of the 1L Indenture. The Cooperation Agreement—to which, on information and belief, each Favored Holder is a party—selects New York law as its governing law and the courts of New York for all disputes arising from or under the Cooperation Agreement. In addition, the 1L Indenture governing the 1L Notes at issue (including those that were held by each of the Favored Holders) contains both a choice-of-law provision selecting New York law as the governing law and a forum-selection clause selecting the federal or state courts located in the State and City of New York. 1L Indenture § 14.05 (Agent for Service; Submission to Jurisdiction; Waiver of Immunities), 1L Indenture § 14.07 (Governing Law). The Favored Holders are bound by those clauses because they are intended third-party beneficiaries of the 1L Indenture.

45. This Court has personal jurisdiction over the Selecta Group B.V. Directors because they are closely related to Selecta Group B.V. by way of their roles as Selecta Group B.V. Directors, their involvement, on information and belief, in the Restructuring and issuance of the

bonds, and therefore are bound by the forum-selection clause in the 1L Indenture as well as to Selecta Group B.V.'s consent to personal jurisdiction in the 1L Indenture. 1L Indenture § 14.05 (Agent for Service; Submission to Jurisdiction; Waiver of Immunities), 1L Indenture § 14.07 (Governing Law).

46. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), as well as under Section 12 of the Clayton Act, 15 U.S.C. § 12. Among other things, each of the Defendants consented to and/or is bound by provisions that require venue in this District. 1L Indenture § 14.05 (Agent for Service; Submission to Jurisdiction; Waiver of Immunities), 1L Indenture § 14.07 (Governing Law); 3O Indenture § 14.05 (Agent for Service; Submission to Jurisdiction; Waiver of Immunities), 3O Indenture § 14.07 (Governing Law); Cooperation Agreement ¶ 24.

47. Defendants' conduct has had a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States, including in this jurisdiction. Defendants have purposefully availed themselves of the laws of the United States, including the federal antitrust laws, and New York state laws, by marketing and trading notes subject to New York law in interstate commerce.

## FACTUAL BACKGROUND

### I. Selecta Group B.V.'s Capital Structure Prior to the Restructuring

48. Selecta Group is an international food technology company based in Switzerland specializing in self-service food and beverage retail and coffee services.

49. Prior to the Restructuring, Selecta Group B.V.'s shares were held by a parent company, Selecta Group AG. Selecta Group B.V., in turn, held all of the equity of its subsidiary—Selecta AG—which itself held shares in various operating companies.

50. Prior to the Restructuring, Selecta Group B.V. carried the following liabilities:

- A super senior revolving credit facility (the "Super Senior Credit Facility") (upon information and belief) in the amount of €150 million, scheduled to mature in 2026;
- First lien notes (as defined above, the "1L Notes"), of which (upon information and belief) there was approximately €821 million outstanding immediately prior to the Restructuring; and
- Second lien notes (the "2L Notes"), of which (upon information and belief) there was approximately €377 million outstanding immediately prior to the Restructuring.

51. Prior to the Restructuring, one of Selecta Group B.V.'s indirect parent companies—Selecta Group FinCo S.A.—issued two classes of Preference Shares that (upon information and belief) were outstanding in the amount of approximately €724 million (the "Preference Shares"). Upon information and belief, neither Selecta Group B.V. nor any of its subsidiaries was liable with respect to the Preference Shares.

52. The diagram below[12] shows the organization of Selecta Group B.V.'s affiliates and Selecta Group's liabilities before the Restructuring.

[12] *Market Update*, SELECTA, at 23 (June 11, 2025), https://www.selecta.com/dam/jcr:c68bfbb6-66d5-4eb6-959e-15419e1b08c7/Selecta%20Market%20Update.pdf (the "Market Update"). The June 11 Market Update is attached hereto as Exhibit G.




53. Selecta Group B.V. issued the 1L Notes pursuant to the 1L Indenture. Fifteen Guarantors completely and unconditionally guaranteed the 1L Holders' rights to payment under the 1L Notes. 1L Indenture at Schedule B; 1L Indenture § 11.01.[13] The 1L Notes were scheduled to mature on April 1, 2026.

54. Upon information and belief, Selecta Group B.V. issued the 2L Notes pursuant to an indenture also dated as of October 29, 2020 (as amended or supplemented from time to time, the "2L Indenture") by and between Selecta Group B.V. (as Issuer), the Guarantors (as defined in the 2L Indenture), Kroll, as Trustee and Security Agent, and Elavon Financial Services DAC, as

13 Upon information and belief, due to mergers and dissolutions of certain Guarantors, there are currently twelve Guarantors obligated to make payment of the 1L Notes.

Paying Agent, Transfer Agent, and Registrar. Like the Super Senior Credit Facility and the 1L Notes, the 2L Notes were also set to mature in 2026.

55. As security for the 1L Notes, Selecta Group B.V.'s direct parent—Selecta Group AG—pledged all its shares in Selecta Group B.V. (the "Share Pledge"). Schedule A to 1L Indenture. The agreements providing for the Share Pledge are governed by Dutch law. *Id.*; Dutch Decision at 2.6.

56. Upon information and belief, both the 1L Notes and 2L Notes were held through the clearing agencies, Euroclear and/or Clearstream.

57. Upon information and belief, before the Restructuring, the Favored Holders held at least 64.6% of the 1L Notes and 83% of the 2L Notes.

## II. The 1L Notes Indenture

58. The 1L Notes provided that the Issuer—Selecta Group B.V.—would make semi-annual interest payments to the 1L Holders. 1L Indenture at Back of Euro Note at A-2-6; *id.* Back of CHF Note at A-2-6; *id.* § 14.13. The principal of the 1L Notes would be repaid on the 1L Notes' maturity date, April 1, 2026.

59. Selecta Group B.V.'s obligation to pay principal and interest to the 1L Holders is confirmed in, among other provisions, Section 4.01 of the 1L Indenture:

> The Issuer will pay or cause to be paid the principal of, premium on, if any, interest and Additional Amounts, if any, on, the Notes on the dates and in the manner provided in the Notes and this Indenture.

1L Indenture § 4.01.

60. Section 9.02 of the 1L Indenture restricts the ability of Selecta Group B.V. to take certain actions without the consent of a majority (and in certain instances, a supermajority) of the 1L Holders. Important here, Section 9.02 required Selecta Group B.V. to obtain consent from no less than 90% of the 1L Holders to alter any of the key financial terms of the notes (often referred

to as "sacred rights"), including but not limited to the applicable interest rate, the dates upon which interest is due, the principal amount, the maturity date, or the "currency" in which the 1L Notes were payable. The same 90% threshold restricted Selecta Group B.V.'s ability to effectuate a release of any collateral securing the 1L Notes or any of the 1L Notes' Guarantors. 1L Indenture §§ 6.04, 9.02.

61. Upon an Event of Default—including the failure of the Issuer to make a required interest payment—Section 6.02 of the 1L Indenture permits 1L Holders of at least 30% in aggregate principal amount of the outstanding 1L Notes to accelerate the 1L Notes, making all principal and interest immediately due and payable. 1L Indenture § 6.02(a).

62. Upon an Event of Default, the Trustee under the 1L Indenture (the "1L Trustee") is authorized to pursue a variety of remedies against Selecta Group B.V. and the Guarantors, including the enforcement of any Security Document (as defined therein).

63. To the extent the 1L Trustee (or the Security Agent acting pursuant to the Intercreditor Agreement, discussed below) collects any money from the enforcement of a Security Document (as defined in the 1L Indenture, including the enforcement of the Share Pledge), that money is to be paid out:

> to Holders for amounts due and unpaid on the Notes for principal, premium, if any, interest and Additional Amounts, if any, ***ratably, without preference or priority of any kind***, according to the amounts due and payable on the Notes for principal, premium, if any, interest and Additional Amounts, if any, respectively.

1L Indenture § 6.10 (emphasis added). As detailed below, Defendants—relying on a combination of collusion and manipulation—used the Restructuring to extract for the exclusive benefit of the Favored Holders a disproportionate share of the value collected from the enforcement of the Share Pledge. As a result, the Restructuring violated the 1L Indenture's requirement that any recovery

resulting from the enforcement of the 1L Holders' security interests be paid out "ratably, without preference or priority of any kind." *Id.*

64. Under Section 10.06 of the 1L Indenture, any enforcement of the 1L Holders' security rights would be conducted by the Security Agent pursuant to the terms of the Intercreditor Agreement (discussed immediately below). Critically, under subsection (a) of Section 10.06, the Security Agent is required to act "for the benefit of ***all*** holders of secured obligations." *Id.* § 10.06(a) (emphasis added). Because the Security Agent in this matter acted primarily for the benefit of the Favored Holders (not "all" 1L Holders), the Restructuring also violated this provision of the 1L Indenture.

## III. The Intercreditor Agreement

65. On January 31, 2018, two years before the issuance of the 1L Notes, Selecta Group B.V., its affiliates, the trustees and representatives appointed to its various groups of lenders executed an Intercreditor Agreement governing the interrelationship, rights, and obligations of various levels of Selecta Group's debt and the security interests relating thereto.

66. The 1L Indenture refers to the Intercreditor Agreement, which by its terms authorizes a "Security Agent" to take various actions in the event there is an enforcement of the 1L Holders' security interests. As relevant in this case, Clause 14.2, in connection with Clauses 12.2 and 12.3, of the Intercreditor Agreement provides for a "Distressed Disposal," which authorizes the Security Agent to take certain actions related to the collateral, including, under certain circumstances, the sale of the collateral to third parties, and the release of security interests or debt obligations that may attach to such collateral.

67. The Intercreditor Agreement includes specific limitations on the Security Agent's ability to release liabilities, however. First, where the proposed Distressed Disposal "present[s] a

material risk of liability for any member of the [Selecta] Group and/or its directors or officers, or give[s] rise to a material risk of breach of fiduciary or statutory duties," the provisions of the Intercreditor Agreement cannot override conflicting provisions in the underlying debt documents, including but not limited to (1) Indenture Section 9.02's requirement that 90% of 1L Holders consent to any changes to the 1L payment terms (as opposed to the majority consent threshold included in the ICA), *see* Intercreditor Agreement Clause 1.2(z) (conflict of interest provision), 1L Indenture § 9.02 (90% threshold requirement for changes to sacred rights), and Intercreditor Agreement Clauses 12.2 and 14.2 (majority consent requirement for Distressed Disposal), and (2) 1L Indenture Section 4.01 and 14.13's requirement that 1L Holders be paid in cash; *see* 1L Indenture §§ 4.01, 14.13; Intercreditor Agreement Schedule 5. As discussed below, because the transactions at issue here did give rise to a material risk of liability for Selecta Group B.V. and its directors based on breaches of both fiduciary and statutory duties, the Security Agent was required to, among other things, secure 90% approval from the 1L Holders before proceeding with the Restructuring and make all payments to 1L Holders in cash.

68. Second, under Clause 15.1 of the Intercreditor Agreement, any proceeds from a Distressed Disposal executed pursuant to Clause 14.2 must be paid ratably to creditors. As relevant here, Clause 15.1 of the Intercreditor Agreement provides that payments must be made to the 1L Trustee to be paid "in accordance with the terms of the [1L Indenture]." Intercreditor Agreement Clause 15.1. As discussed above, the 1L Indenture specifically requires any payments to 1L Holders resulting from any enforcement action to be made "***ratably, without preference or priority of any kind.***" 1L Indenture § 6.10 (emphasis added). In addition, and as discussed above, Section 10.06(a) of the 1L Indenture required the Security Agent to act on behalf of "***all***" 1L Holders, not

just the Favored Holders. Thus, by its terms, the Intercreditor Agreement prohibits any transaction that favored some 1L Holders over others.

69. Separate from its limitations on Distressed Disposals, the Intercreditor Agreement also prohibits Selecta Group B.V. and its affiliates from guaranteeing, indemnifying, or providing other assurances to certain holders of its debt without indemnifying, guaranteeing or providing identical assurances to other parties holding the same debt. The Intercreditor Agreement specifically includes provisions limiting the times when 1L Holders may take or receive the benefit of "any guarantee, indemnity or other assurance against loss from any member of the Group or from a Third Party Security Provider in respect of the [1L Notes]." Intercreditor Agreement Clause 3.3(b). Such guarantees, indemnities or assurances were allowed only if similarly situated holders "already benefit from such a guarantee, indemnity or other assurance against loss or at the same time it is also offered to other" similarly situated holders. *Id.*

## IV. <u>The Cooperation Agreement</u>

70. Upon information and belief, Selecta Group B.V. recognized in 2024 that it would be unable to pay all its debt obligations maturing in 2026 (including the Super Senior Credit Facility, the 1L Notes, and the 2L Notes), and would also likely miss interest payments on its debt that it was required to make before those obligations matured. Facing the prospect of a material payment default, upon information and belief, Selecta Group B.V. began reaching out to certain of its creditors (including certain of the 1L Holders) who might consent to a restructuring of its debt.

71. Upon information and belief, in or around November 2024, Selecta Group B.V.'s outreach efforts led to the formation of two separate ad hoc creditor groups. One group consisted entirely of a group of 1L Holders. The other group included a mixture of 1L Holders, 2L Holders,

and holders of the Preference Shares issued by Selecta Group FinCo S.A.[14] Upon information and belief, the two ad hoc creditor groups ultimately merged to become the Favored Holders.

72. Upon information and belief, the Favored Holders signed an initial cooperation agreement in December 2024 (the "Initial Cooperation Agreement"), after which they began negotiating with Selecta Group B.V. concerning the terms of the Restructuring.

73. Upon information and belief, Selecta Group B.V. and the Favored Holders intentionally concealed the details of their negotiations from any creditors not included in the Favored Holders group. Upon information and belief, they did this to prevent Plaintiffs and other Excluded Holders from being able to challenge the Restructuring before its execution.

74. Upon information and belief, Selecta Group B.V. missed an interest payment due on the 1L Notes on January 2, 2025. Under the terms of the 1L Indenture, Selecta Group B.V. had 30 days to cure its failure to make a required interest payment. 1L Indenture § 6.01(a)(1).

75. Approximately two weeks later, on January 13, 2025, Selecta Group announced that a majority group of 1L Holders (upon information and belief, the Favored Holders) had agreed to extend the cure period for its payment default. On the same day, Selecta Group also announced that: (i) it had secured a new credit facility in the amount of €50 million[15] (the "Interim Financing") funded by existing holders; and (ii) it was continuing to hold conversations with a group of stakeholders (upon information and belief, the Favored Holders) representing a majority of the 1L Notes, the 2L Notes, and its Class A Preferred Shares.

---

[14] As noted *supra*, Selecta Group B.V. had no obligations with respect to the Preference Shares issued by Selecta Group FinCo S.A. (its indirect parent).

[15] Upon information and belief, the total amount outstanding on the interim facility immediately before the Restructuring was approximately €60 million, consisting of the original €50 million in principal and €10 million in accrued interest and fees.

76. Upon information and belief, on April 9, 2025, the Favored Holders entered into a new cooperation agreement that supplanted the Initial Cooperation Agreement (as defined above, the "Cooperation Agreement"). Upon information and belief, the Cooperation Agreement went into effect upon the issuance of the 1O Notes and by its terms will remain in effect during the following 12 months. Cooperation Agreement ¶ 17.

77. Upon information and belief, in substance, the Cooperation Agreement bars each of the Favored Holders from allying with any other group of creditors and from supporting any transaction that does not exclusively benefit the Favored Holders and the securities they held (defined in the Cooperation Agreement as "Subject Instruments").

78. Upon information and belief, in Section 10(A) of the Cooperation Agreement, each signing party agreed that it would support, vote for and/or consent to any transactions so long as they did not "have the effect of adversely affecting any right or interest of the Coop Parties (including by way of offering any advantageous treatment to any 1O Notes that are not [subject to the Cooperation Agreement])." Cooperation Agreement ¶ 10(A).

79. The Favored Holders also agreed in the Cooperation Agreement, upon information and belief, that they could not sell their Subject Instruments to any third-party unless the purchaser agreed to comply with the Cooperation Agreement's terms. Cooperation Agreement ¶ 12. Any purported sale of Subject Instruments that violated this provision would be "void ab initio." *Id.* ¶ 13.

80. Upon information and belief, absent the Cooperation Agreement, no Favored Holder individually held sufficient notes to direct the Security Agent to engage in the steps necessary for the Restructuring.

81. Plaintiffs, and upon information and belief other minority 1L holders (as defined above, the "Excluded Holders"), were not permitted to join the Cooperation Agreement. Both CQS and Algebris reached out to representatives of Selecta Group B.V. to discuss potential refinancing options, but Selecta Group B.V.'s representatives were unwilling to engage in substantive discussions.

82. On March 20, 2025, and again on May 6 and 7, 2025, Deltroit reached out to Selecta Group B.V.'s advisors in the hopes of participating in negotiations regarding the terms of the Restructuring. On May 7, 2025, Deltroit also reached out to Selecta Group B.V. directly. Despite these requests and efforts to engage, Deltroit was not permitted to participate in the negotiations over the form or timing of the Restructuring.

83. Upon information and belief, exclusivity was an integral part of the Defendants' Restructuring scheme. Only by depriving the Excluded Holders of their rights to share proportionately in the proceeds of the Share Pledge could the Favored Holders improve their own economic position.

84. Upon information and belief, the Favored Holders and the Excluded Holders, including Plaintiffs, constitute competitors for the marketing, trading and sale of the debt at issue, with each of the Favored and Excluded Holders individually interested in maximizing its respective returns on its investments in Selecta Group B.V. As described herein, Defendants' anticompetitive conduct exclusively targeted the market for Selecta Group B.V.'s first lien debt.

## V. The Restructuring

### a. The Favored Holders and Selecta Group B.V. Incorporate a New Company and Accelerate the 1L Notes

85. Upon information and belief, prior to the Restructuring negotiated by the Favored Holders and Selecta Group B.V., certain Favored Holders incorporated a new company, Seagull

Topco Limited ("Topco"), in Jersey, which was wholly owned by a corporate services provider before the Restructuring. *See* Exchange Memorandum at 6. Topco subsequently incorporated a new entity as its wholly owned subsidiary, Seagull Holdco Limited. *Id.* On April 2, 2025, Seagull Holdco Limited incorporated yet another new entity, Bidco, as its wholly owned subsidiary. *Id.*

86. Upon information and belief, the cure period related to the 1L Notes expired on or before April 30, 2025, leaving Selecta Group B.V. in Default under the 1L Indenture. *See* Exchange Memorandum at 6; 1L Indenture § 6.01. Upon information and belief, following this Event of Default the Favored Holders instructed the Trustee to accelerate the 1L Notes pursuant to Section 6.02 of the 1L Indenture. Exchange Memorandum at 6.

**b. Selecta Group B.V. Announces the Restructuring without Disclosing Key Terms**

87. On April 30, 2025, Selecta Group B.V. announced that it had entered into a "transformative recapitalisation agreement" (upon information and belief, the Framework Agreement) with its creditors that would allow for a "comprehensive recapitalization" of the company's finances.[16] Selecta Group B.V. acknowledged that it negotiated and entered into this agreement with creditors representing a majority of the 1L Notes. Market Update at 21. As discussed *infra*, Plaintiffs were denied the opportunity to participate in the negotiations leading up to the Framework Agreement.[17]

---

[16] *Selecta Group Secures Transformative Recapitalisation Agreement*, SELECTA GROUP B.V. (April 30, 2025), https://www.selecta.com/int/en/selecta-group/newsroom/selecta-group-transformative-recapitalisation-agreement.

[17] As noted above, because the Restructuring did not result in a "ratable" distribution of value among 1L Holders, Selecta B.V. was required (but failed) to obtain consent from 90% of the 1L Holders, as per the provisions of the 1L Indenture. Upon information and belief, Selecta Group B.V. and Kroll (in its capacity as Trustee of the 1L Notes, Security Agent under the Intercreditor Agreement, Trustee of the 3O Notes, and Trustee of the 1O Notes) understood the negative impact the Restructuring would have on the Excluded Holders due to the non-ratable distribution and the vulnerabilities built into the 1O Notes.

88. Upon information and belief, on April 30, 2025, Selecta Group B.V. entered into a deed of indemnity with, inter alia, the Security Agent (in respect of the Intercreditor Agreement) and the 1L Trustee (in respect of the 1L Indenture) (the "Company Indemnity") in respect of any claim that may be brought in future against the Security Agent and/or Trustee for, upon information and belief, loss caused by steps taken by the Security Agent and/or 1L Trustee pursuant to the Framework Agreement and/or the Restructuring as a whole. Neither Selecta Group B.V. nor Kroll (in its capacity as Security Agent and Trustee) has ever disclosed a copy of this agreement.

89. Market analysts expressed surprise and concern that, in making its announcement, Selecta Group B.V. failed to disclose the key elements of its proposed recapitalization. As one analyst wrote:

> When the press release landed for Selecta's "comprehensive" recapitalization agreement - restructuring appears to be a banned word nowadays - I looked beyond the bullets and the promotional quote from the CEO, "a transformational and positive step forward for Selecta," for the outline terms at the bottom of the release.
>
> But there was nothing more; nada, diddly squat. Just two pages, and one was CEO quotes.
>
> Surely there would be something more on the investor relations page for the Swiss-based food tech company (plain English translation: vending machines), perhaps a cleansing statement with a pre/post capital structure and a term sheet of sorts for the new-money paper and reinstated debt?
>
> Nope. Many non-committee first-lien and second-lien bondholders were also in the dark. We were told it could take weeks/months for a cleansing presentation to arrive.
>
> . . . .
>
> The details of the 'comprehensive agreement' announcement were noncomprehensive at best, with some of the language as cryptic as the clues in *The Times* crossword.[18]

[18] Chris Haffenden, *EMEA Special Sits Weekly: Selecta-tive Information Disclosure; Essity Existential Threat for Bondholder Beneficiaries; Loaded Revolvers*, OCTUS (May 9, 2025),

90. Upon information and belief, with respect to the 1L Notes held by Plaintiffs, the Framework Agreement signed by Selecta Group B.V., Selecta Group AG, and the Favored Holders required Selecta Group B.V. and Selecta Group AG to consent to and cooperate with a multi-step process:

- First, the sale of Selecta Group AG's shares in Selecta Group B.V. to Bidco, the release of the 1L Notes, and the issuance by Bidco of the 3O Notes to the 1L Holders; [19]
- Second, Bidco's offer to exchange the 3O Notes for 1O Notes in return for the 3O Holders' consent to revised indenture terms, including the elimination of the 90% consent threshold included in the 1L Indenture; and
- Third, the further consolidation of control by the Favored Holders by leveraging the 2L Notes.[20]

**c. The Enforcement of the Share Pledge, the Release of the 1L Notes, and the Issuance of the 3O Notes**

91. On April 30, 2025, the Favored Holders who held 1L Notes instructed the Security Agent to enforce the Share Pledge over the shares in Selecta Group B.V., pursuant to Clauses 12.2, 12.3, and 14.2 of the Intercreditor Agreement. Exchange Memorandum at 6.

92. On the same day, the Security Agent commenced a proceeding in the Netherlands Commercial Court (the "NCC") with case number C/13/768479 to sanction the enforcement of the Share Pledge.

---

EMEA_Special_Sits_Weekly_-_2025-05-09_09_33_05_-_EMEA_Special_Sits_Weekly__Selecta-tive_Information_Disclosure__Essity_Existential_Threat_for_Bondhold-60580-0.pdf.

[19] Market Update at 21; Exchange Memorandum at 6-7.

[20] Bidco issued an Offering and Exchange Memorandum, dated June 17, 2025 (as defined above, the "Exchange Memorandum"), to make these subsequent offers.

93. Kroll (which upon information and belief was acting under the instructions of the Favored Holders) provided minimal (and insufficient) notice to the Excluded Holders regarding the NCC proceeding. Indeed, the notice provided by Kroll disclosed only that an Event of Default had occurred and that a court case had been commenced in the Netherlands:

> **NOTICE IS HEREBY GIVEN,** in accordance with Section 7.05 (*Notice of Defaults*) of the Indenture, that the Trustee has received a notice from the Issuer dated 30 April 2025 (the "**Issuer Notice**") in which the Issuer informed the Trustee that an Event of Default has occurred and is continuing under Section 6.01(a)(1) of the Indenture. The Security Agent has subsequently filed on 30 April 2025 a petition with the court in preliminary relief proceedings (voorzieningenrechter) of the Netherlands Commercial Court requesting its approval to enforce Transaction Security (as defined in the Intercreditor Agreement) over the shares of the Issuer without a hearing.

An exemplar notice provided by Kroll is attached as Exhibit H.

94. As shown above, the notice Kroll provided to the Excluded Holders failed to disclose that: (i) after the transfer of Selecta Group B.V.'s equity to Bidco, the Excluded Holders' 1L Notes would be replaced with lower ranked (and out of the money) 3O Notes; and (ii) holders of the 3O Notes would be able to exchange those securities for higher ranked (and in the money) 1O Notes ***only*** if they gave up the sacred rights guaranteed to them by the 1L Indenture and the (replacement) 3O Indenture and any rights to challenge the Restructuring. The notice also failed to inform the Excluded Holders that they had the right to participate in the NCC proceeding.

95. In the proceeding in front of the NCC, Bidco, Selecta Group AG, and Selecta Group B.V. all waived their right to be heard. Dutch Decision at 1.3.

96. In its papers initiating the proceeding, Kroll (in its capacity as Security Agent) asked that the Court ***not*** hold a public hearing. This helped to ensure that the NCC proceeding would be concluded before any of the Excluded Holders would be able to effectively exercise their rights under Dutch law. By keeping Plaintiffs and other Excluded Holders from participating,

Selecta Group B.V., Selecta Group AG, and the Favored Holders (acting through Kroll) ensured no adverse party would present compromising facts to the NCC, thereby allowing Selecta Group B.V., Selecta Group AG, and the Favored Holders to execute one of the most controversial restructurings of recent years.

97. On May 13, 2025, the NCC issued its decision (as defined above, the "Dutch Decision"). The Dutch Decision was not made public until June 2025.

98. The Dutch Decision approved the transfer of the shares in Selecta Group B.V. from Selecta Group AG to Bidco via a private foreclosure sale pursuant to a share purchase agreement (the "Share Purchase Agreement") negotiated by the Security Agent with Bidco. Dutch Decision ¶¶ 2.10, 5.1. According to the Dutch Decision, Selecta Group AG and Bidco the sale of the shares would be for consideration consisting of €1 and a non-cash obligation to release Selecta Group B.V. from "a considerable portion" of its outstanding debt. Dutch Decision ¶¶ 2.11, 5.1.

99. The Dutch Decision makes no reference to the 1L Notes and does not purport to approve any exchange related to the 1L Notes nor any release of the 1L Holders' right to payment. *Cf. id.* Upon information and belief, Selecta Group B.V., Selecta Group AG, and Bidco intentionally concealed from the NCC the fact that 1L Holders would in the first instance receive subordinated securities (i.e., the 3O Notes). In making its decision, the NCC noted that the information provided by Kroll indicated that "under the given time restraints there are no other (private) funding options available to [Selecta]." Dutch Decision ¶¶ 2.10, 2.12, 4.9, 4.12. Upon information and belief, the NCC's statement regarding the lack of availing funding alternatives was the result of misrepresentations by Defendants made (through Kroll) to the Dutch court.[21]

---

[21] Although Selecta's characterization of the Restructuring suggests that the Selecta Group B.V. would receive a reduction of its debt in the amount of over EUR 1 billion because of the share transfer to Bidco, the actual reduction was much lower. Selecta Group B.V. was allegedly released

100. Despite numerous requests, Selecta Group B.V., Bidco, and Kroll (in its capacity as Security Agent) have refused to provide Plaintiffs access to the case file or any of the above-referenced documents. Upon information and belief, Selecta Group B.V. and the Favored Holders deliberately concealed these documents from Plaintiffs and the Excluded Holders to thwart any challenge to the Restructuring. A motion to provide the case file is currently pending before the NCC's Court of Appeal, as part of appeals against the Dutch Decision filed on behalf of Deltroit, CQS, and Algebris.

101. On June 11, 2025, Selecta Group B.V., Selecta Group AG, Bidco, and Kroll completed the "Distressed Disposal," in connection with which the shares in Selecta Group B.V. were transferred from Selecta Group AG to Bidco and the 1L Notes, 2L Notes, and the Interim Financing were transferred from Selecta Group B.V. to Bidco On the same day, Selecta Group B.V. published the Market Update, which for the first time described the Restructuring at a high level. Exchange Memorandum at 29.

from approximately €1.198 billion in debt under the 1L Notes and 2L Notes. But Bidco (and, by way of guarantee, Selecta Group B.V.) reportedly incurred additional debt of approximately €1.125 billion in connection with the transaction, meaning that the net reduction in debt for Selecta Group B.V. was only €73 million. On June 11, 2025, Selecta Group B.V. reported that its restructuring reduced its total debt from €2,129 billion to €1,086 billion. Market Update at 22. Upon information and belief, most of that reduction resulted from the conversion of the €724 million Preference Shares issued by Selecta Group FinCo S.A. to equity in Bidco's new parent company. Upon information and belief, Selecta Group B.V. was never liable for the Preference Shares and their release had no impact on Selecta Group B.V.'s financial position. Industry analysts agree that "the transaction does not result in meaningful deleveraging." Charlie Ward, *WATERFALL ANALYSIS: Selecta's Recapitalization Leaves Group Significantly Overlevered, Base Case LTV of 129.4%; Value Breaks in 2O for 31.3% Recovery on Day 1; Opens Door for Second Restructuring*, OCTUS (Aug. 7, 2025, at 6:36 EDT), Selecta_Group_BV_-_2025-08-07_06_36_19_-_WATERFALL_ANALYSIS__Selecta___s_Recapitalization_Leaves_Group_Significantly_Overlevered__Base_Case_LTV_of_129-60580-0.pdf.

102. Also on June 11, 2025, holders of the existing 1L Notes received the 3O Notes issued by Bidco, for a value equal to 85% of the existing principal face amount of the 1L Notes. The 3O Notes are governed by the 3O Indenture. Kroll serves as Indenture Trustee for the 3O Notes. The 3O Notes have a November 2030 maturity date and are governed by New York law.

103. Like the 1L Notes for which they were involuntarily exchanged, the 3O Notes require 90% of holders to consent to amendments to sacred rights and economic terms in the governing documents, including but not limited to the principal amount of the notes, the applicable interest rate, or the maturity date. Selecta Group B.V. is identified as an "Initial Guarantor" of this debt. 3O Indenture at Schedule B.

104. In addition to receiving the 3O Notes, holders of the 1L Notes also received 15.3% of the equity in Topco, Selecta Group B.V.'s new holding company, in the form of non-voting, B shares.[22] To claim this equity, the holders had to accede to the investment agreement dated June 10, 2025, by and between Seagull Topco Limited, certain shareholders, Kroll Issuer Services Limited, 12 Capital Markets Ltd., and each other person who may adhere to the terms of the agreement.

105. By forcibly exchanging Plaintiffs' 1L Notes for the 3O Notes, Selecta Group B.V. and Kroll violated the terms of the 1L Indenture in multiple ways. First, instead of paying 1L Holders the principal and interest they were owed under the 1L Notes, Selecta Group B.V. instead attempted to make payment in new debt securities (something not contemplated under the 1L Indenture). Second, Selecta Group B.V. did not make a "ratable" distribution of proceeds to the

[22] Upon information and belief, the proportion of equity actually held by the existing 3O Holders is actually closer to around 4-5% of Topco's equity because of the portion of the 3O Notes that exchanged for 1O Notes had to also surrender their Topco equity, Exchange Memorandum at 8–9.

1L Holders, instead issuing subordinated (i.e., "third out") securities that only ***some*** of the 1L Holders (the "Favored Holders") could safely exchange for 1O Notes (because of the elimination of the 90% consent requirement in the 1O Indenture and the existence of the Cooperation Agreement). Third, Selecta Group B.V. took the foregoing actions without obtaining approval from 90% of holders, as required by Sections 6.04 and 9.02 of the 1L Indenture. Fourth, Kroll (in its capacity as Security Agent) executed a transaction that primarily benefited the Favored Holders—not "all" 1L Holders, as required by Section 10.06(a) of the 1L Indenture.

106. Selecta Group B.V.'s violation of the 1L Indenture was not excused by the Intercreditor Agreement, for at least three reasons. First, under Clause 1.2(z) of the Intercreditor Agreement, Selecta Group B.V. and the 1L Trustee could not ignore applicable provisions of the 1L Indenture where a proposed Distressed Disposal "present[ed] a material risk of liability for any member of the Group and/or its directors or officers, or give[s] rise to a material risk of breach of fiduciary or statutory duties." Intercreditor Agreement Clause 1.2(z). Here, the release of the 1L Notes was part of an overall scheme that violated various antitrust laws (as alleged in paragraphs 134–173 below) and gave rise to a material risk of breach of fiduciary duties (as alleged in paragraphs 227–236 below). Bidco acknowledged this fact in the Exchange Memorandum, which (as noted above) disclosed the risks of a legal challenge to the Restructuring and the fact that Bidco had agreed to indemnify the Favored Holders for any such claims. Exchange Memorandum at 90. Because the Restructuring resulted in a clear (and admitted) risk of liability, the terms of the Intercreditor Agreement did not control and Selecta Group B.V. was obliged to comply with the more stringent terms of the 1L Indenture. Second, Clause 15.1(d) of the Intercreditor Agreement requires that amounts recovered or received by the Security Agent in connection with the enforcement of creditors' security interests must be applied in payment to the 1L Holders in

accordance with the terms of the 1L Indenture. That means that under the terms of the Intercreditor Agreement the Trustee of the 1L Indenture was required to comply with the 1L Indenture's obligations to "ratably" distribute the proceeds from the Distressed Disposal, "without preference or priority of any kind." 1L Indenture § 6.10. Likewise, under Section 10.06(a) of the Indenture, the Security Agent was required to act "for the benefit of ***all*** holders of secured obligations." (emphasis added).[23]

**d. Bidco Makes the Exchange Offer for the 3O Notes**

107. On June 17, 2025, Bidco initiated the purported "exchange offer" for the 3O Notes (the "3O Exchange") and also made a new money offer for holders of the former 2L Notes (the "New Money Offer") pursuant to the Exchange Memorandum.[24] Holders of the 3O Notes could exchange their 3O Notes for 1O Notes that rank senior to the 3O and 2O Notes (defined below). Kroll serves as Indenture Trustee for the 1O Notes.

108. The 1O Notes had a September 2030 maturity date and would be issued in €1,000 of 1O Notes for every €850 of 3O Notes, essentially reversing the 15% reduction that holders suffered when the 3O Notes replaced the 1L Notes. Like the 3O Notes, Selecta Group B.V. was identified as an "Initial Guarantor" of this debt. Exchange Memorandum at 507.

109. But, unlike the 3O Notes, ***the 1O Notes Indenture permitted changes to the holders' sacred rights during the first twelve months following their issuance***—including but not limited to the amount of principal owed by the issuer, the applicable interest rate, and the maturity

23 The Intercreditor Agreement similarly could not operate to excuse the Guarantors' obligations under the 1L Indenture.

24 The Favored Holders exchanged their 3O Notes for 1O Notes through a private exchange on June 12, 2025, ahead of the exchange offer open to the Excluded Holders. *Supra* ¶ 5 n.4. The Favored Holders also provided new money via a private placement. Exchange Memorandum at 7.

for the notes—upon the consent of a bare majority of holders. Upon information and belief, the Favored Holders already hold a majority of the 1O Notes, and the Cooperation Agreement requires all the Favored Holders to consent to any changes to the 1O Holders' sacred rights proposed by Selecta Group that do not adversely affect the interests of the Favored Holders.

110. The Exchange Memorandum acknowledged the risk that the Favored Holders could destroy the value of any 1O Notes held by Excluded Holders:

> Under the terms of the 1O Notes Indenture, the economic terms, such as principal amount, maturity, and interest rate, and the ranking (including in respect of priority in an event of enforcement under the Intercreditor Agreement (as defined below)) of the 1O Notes, may be amended, and all or substantially all guarantees and collateral may be released, with the consent of holders of a majority of the principal amount outstanding of the 1O Notes during the 12M Reduced Threshold Period. Even assuming that all Existing 3O Noteholders exchange their Existing 3O Notes for 1O Notes, the [Favored Holders] collectively will hold 64.6% of the outstanding aggregate principal amount of the 1O Notes, and therefore the [Favored Holders], should they act together, as they have done to date, will be able to control any and all votes on 1O Notes (including in respect of amendments and waivers of economic terms, such as principal amount, maturity and interest rate, and ranking for all outstanding 1O Notes and in respect of the release of all or substantially all guarantees and collateral) during the 12M Reduced Threshold Period.

Exchange Memorandum at 8–9.

111. The Exchange Memorandum also disclosed that, under the terms of the 1O Indenture, Bidco could pay ***some*** (but not ***all***) of the 1O Holders to incentivize them to amend the 1O Notes in a way that would destroy their value:

> As the economic terms and other terms can be amended with the consent of holders of a majority of the principal amount outstanding of ***the 1O Notes and as the "payments for consent" clause will not apply during the 12M Reduced Threshold Period***, we could offer to exchange the 1O Notes of [Favored Holders] following the Exchange Offer and have the holders to which we make the offer agree to amendments to the economic terms, or to subordinate or release all or substantially all guarantees and collateral of 1O Notes that secure claims of the holders of 1O Notes not participating in such subsequent exchange offer.

Exchange Memorandum at 9 (emphasis added).

112. In effect, the terms of the 1O Indenture would allow Bidco (which is owned by the Favored Holders) and its affiliates to pay the Favored Holders (which hold a majority of the 1O Notes) to destroy the value of the 1O Notes. Excluded Holders who exchange their 3O Notes for 1O Notes would have no ability to prevent this result, because (by design) the Favored Holders control the majority of the 1O Notes, and the Excluded Holders did not benefit from the opportunity to accede to the Cooperation Agreement.

113. To participate in the 3O Exchange, each 3O Holder had to "renounce[] all right, title and interest in and to all Existing 3O Notes exchanged by it, including any right it may have to challenge the exchange and/or transfer of such Existing 3O Notes." Exchange Memorandum at 114. Each 3O Holder also needed to accede to the Deed of Release to participate, which effectively would have required the holder to release its claims against several parties including but not limited to Selecta Group B.V., Selecta Group AG, and upon information and belief the Favored Holders.

114. 3O Holders who wanted to participate in the 3O Exchange also had to sign the Transaction Support Agreement, which required them to "(i) take all necessary steps to implement, support and consummate the Transaction and (ii) refrain from . . . taking any action that would delay, impede, frustrate or prevent the implementation or consummation of the Transaction." Exchange Memorandum at 1175 (Transaction Support Agreement § 1.01). Section 1.04 of the same agreement required parties to agree to waive their rights to sue Selecta Group B.V. or other 1L Holders that are bound to support the Restructuring or any of their related parties.

115. Upon information and belief, the Favored Holders exchanged their 3O Notes for 1O Notes via a private exchange on June 12, 2025, five days before the exchange was offered to the Excluded Holders. Exchange Memorandum at 8. Upon information and belief, Defendants arranged for the Favored Holders to exchange their 3O Notes ***prior*** to the Excluded Holders in an

attempt to discourage Excluded Holders from trading their 3O Notes for 1O Notes. Because the Favored Holders held a majority of the 3O Notes and exchanged those notes for 1O Notes as a block, the Favored Holders would be free from the outset to change the economic terms of the 1O Notes regardless of how many Excluded Holders made the exchange.

116. Another key advantage negotiated by the Favored Holders was an indemnity from Bidco and, on information and belief other affiliates of the Selecta Group, for any claims arising from the Restructuring. As set forth in the Exchange Memorandum, Bidco's creditors receive payment only after the payment of "any liabilities that may arise pursuant to certain indemnity and cost cover provisions which the Issuer has agreed to provide to certain parties in connection with the Recapitalization." Exchange Memorandum at 90. Similarly, the 1O Indenture (a copy of which is attached to the Exchange Memorandum) states that the proceeds of any future enforcement will be used in the first instance to "discharge any sums owing to an Indemnified Person (as defined in the Seagull Indemnity)." Exchange Memorandum at 419 (1O Indenture § 6.10 (Priorities)). The 1O Indenture defines the Seagull Indemnity as "the indemnity dated April 30, 2025 granted by the Issuer and, upon accession, the Acceding Guarantors to the Indemnified Persons (each as defined therein) . . . " (the "Seagull Indemnity"). Exchange Memorandum at 352 (1O Indenture § 1.01).

117. When Defendants finally revealed the terms of the 3O Exchange, market analysts described it as "invidious,"[25] as containing a "significant catch"[26] for Excluded Holders, and as a "Hobson's Choice."[27] As noted by Bloomberg in an article dated June 11, 2025:

> [T]he deal has been structured in such a way as to discourage top-ranking creditors outside the [Favored Holders] group from swapping their low-priority debt for more senior paper.
>
> . . . .
>
> Following the restructuring, the creditors in the [Favored Holders] group will hold at least 67% of the first-out lien paper, significantly more than the 50% consent needed to vote through changes, according to the statement.
>
> Since they will also have the majority of the equity and the second-out debt, they would have the incentive to make changes that redirect value away from the first-out notes—such as extending the maturity of the debt, reducing the cash coupon or conducting another liability management exercise—in ways that benefit their other holdings at the expense of those outside their group [i.e., the Excluded Holders].[28]

118. Taken together, the foregoing resulted in a clear violation of not only the 1L Indenture but also the Intercreditor Agreement. As noted above: (i) Clause 15.1 of the Intercreditor Agreement provides that payments must be made to the 1L Trustee to be paid "in accordance with the terms of the [1L Indenture]," Intercreditor Agreement Clause 15.1(d), and (ii) the 1L Indenture specifically required any payments to 1L Holders resulting from any enforcement

---

25 Giulia Morpurgo & Libby Cherry, *Selecta's Debt Deal Leaves Bitter Aftertaste for Some Creditors*, BLOOMBERG (June 14, 2025), https://www.bloomberg.com/news/newsletters/2025-06-14/selecta-s-debt-deal-leaves-bitter-aftertaste-for-some-creditors.

26 Irene García Pérez, *Selecta Restructuring Deal Comes with Sting for Some Creditors*, BLOOMBERG LAW (June 11, 2025).

27 Charlie Ward, Mengil Zhang, Shan Qureshi, *Selecta Non-AHG Creditors' Hobson's Choice: 50% Consent for Sacred Rights Amendments of New 1O Notes Forces Subordinated Position, 15% Haircut; Underwater Risk Lingers on High Post-RX Leverage* (June 16, 2025, 03:28 AM ET).

28 García Pérez, *supra* note 16.

action to be made "***ratably, without preference or priority of any kind,***" 1L Indenture § 6.10 (emphasis added), and also required the Security Agent to act on behalf of all 1L Holders (not just the Favored Holders). 1L Indenture § 10.06. Thus, by prioritizing the Favored Holders over the Excluded Holders, Selecta Group B.V. breached ***both*** contracts governing the 1L Holders' rights following an Event of Default.

119. Bidco announced on July 24, 2025, that less than 40% of the Excluded Holders accepted the 3O Exchange.[29] Upon information and belief, most of the Excluded Holders opted not to exchange their notes for 1O Notes because of the risk the Favored Holders would destroy the Excluded Holders' investment.

**e. The Favored Holders Leverage the 2L Notes to Further Consolidate Their Control**

120. At the same time as the 3O Exchange, former holders of Selecta Group B.V.'s 2L Notes were eligible to provide a pro rata share of up to €100 million in new money in exchange for new 2O notes from Bidco (the "2O Notes") set to mature in October of 2030 (as defined above, the "New Money Offer"), which would amount to 10% of the outstanding aggregate principal of the 2O Notes if the offer was fully subscribed. Exchange Memorandum at 8.

121. Bidco also issued 2O Notes through a private placement to holders of former 2L Notes who executed the Framework Agreement (upon information and belief, the Favored Holders) in an aggregate principal amount of €156.4 million. Exchange Memorandum at 7. The holders who participated in this private placement together with the holders who participated in

---

[29] Seagull Bidco Limited, *Announcement regarding Exchange Offer and New Money Offer*, (July 24, 2025), https://www.selecta.com/dam/jcr:9d787932-4984-465f-8e8e-ec68efea2752/Seagull%20-%20Announcement%20regarding%20Exchange%20Offer%20and%20New%20Money%20Offer%20(Revised).pdf.

the New Money Offer together became the "New Money Providers" under the Exchange Memorandum. Exchange Memorandum at 7.

122. In total, the holders of Bidco's 2O Notes received over 82.7% of Topco's equity. Certain holders of 2L Notes (upon information and belief, belonging to the Favored Holders) agreed to backstop the new money offer and received 20% of Topco's equity in the form of Class A2 voting shares in exchange. Exchange Memorandum at 8. The New Money Providers were also eligible to receive a pro rata share of 62.7% of Topco's equity in the form of Class A1 shares upon the execution of the Framework Agreement or Transaction Support Agreement and accession to the Transaction Deed of Release. Exchange Memorandum at 120, 123. And any Topco equity that was relinquished by former 1L Holders who participated in the 3O Exchange was reallocated to holders that participated in the New Money Offer. Exchange Memorandum at 10, 53.

123. The Interim Financing was also refinanced by 2O Notes. Market Update at 18.

## VI. As a Result of the Restructuring, Plaintiffs and the Other Excluded Holders were Stripped of their Rights and Hold Near Worthless Securities

124. As a result of the foregoing, the 1O Notes held by the Favored Holders have traded on the secondary markets at a significantly higher price—indeed, four to five times higher—than the 1O Notes held by Excluded Holders.

125. Specifically, as of October 7, 2025, 1O Notes held by Favored Holders had a bid/ask price of 73.25 cents/75.75 cents while 1O Notes held by Excluded Holders had a bid/ask price of 10 cents/30 cents. The 3O Notes had the same bid/ask price of 10 cents/30 cents.

126. The difference in market price between the 1O Notes held by the Favored and Excluded Holders results from the fact that the securities issued to the Favored Holders and the Excluded Holders effectively have different rights and are, in essence, different securities.

127. By virtue of the Restructuring, the Favored Holders now effectively own Selecta Group B.V. (through the equity they received in Topco and Bidco's acquisition of the Selecta Group B.V.'s shares) and also hold the majority of the 1O Notes and 2O Notes.

128. Upon information and belief, a subset of Favored Holders provided the new super senior debt.

129. The Favored Holders also hold a disproportionate share of the value in the 1O Notes (higher than their pro rata share of the face value of the 1O Notes) because of their ability to amend the sacred rights of 1O Notes held by the Excluded Holders.

130. Upon information and belief, Bidco also provided the Seagull Indemnity (at a time when it had no assets) to the Favored Holders that is senior to the 1O, 2O, and 3O Notes. Upon information and belief, Selecta Group B.V. either agreed to accede to the Seagull Indemnity or gave assurances that it would accede to the Seagull Indemnity prior to the Restructuring. These actions were in direct violation of Clause 3.3 of the Intercreditor Agreement.

131. By virtue of the foregoing, the Favored Holders have effectively gained complete control of Selecta Group's assets and value. Analysts who have looked at the Restructuring after the fact agree, finding that holders of the 3O Notes are out of the money in almost every likely scenario.[30]

132. In contrast, Plaintiffs hold securities (the 3O Notes) that (as Defendants intended from the outset) are likely never to be repaid (and never were likely to be repaid). Nor could they safely trade their 3O Notes for 1O Notes, because the Favored Holders hold the power to destroy the value of the 1O Notes at any time and compensate themselves (but not the Excluded Holders)

---

[30] Ward, *supra* at note 12.

for any resulting losses via incentive payments from Bidco, and the Excluded Holders would have lost all their rights to challenge had they traded.

133. At no point during the Restructuring did Kroll (in its capacity as 1L Trustee, Security Agent, Trustee of the 1O Notes, and/or Trustee of the 3O Notes) ever advise Plaintiffs or the other Excluded Holders (or, indeed, the NCC) that the Favored Holders intended to strip the Excluded Holders' 1L Notes of their value and sacred rights and to funnel the value of Selecta Group B.V. and its affiliates exclusively to the Favored Holders. Upon information and belief, Kroll at no point attempted to stop the Restructuring or attempted to alter its terms.

**COUNT ONE**
**(Unlawful Restraints of Trade, Per Se Violations –**
**Pursuant to 15 U.S.C. §§ 1 and 15 – by the Favored Holders)**

134. Plaintiffs incorporate by reference Paragraphs 1 through 133 of the Complaint as if set forth fully herein.

135. Plaintiffs bring this claim under Section 1 of the Sherman Act and Section 4 of the Clayton Act, 15 U.S.C. §§ 1 and 15, for statutory treble damages, costs, attorneys' fees, and interest.

136. Upon information and belief, the Favored Holders all are creditors of Selecta Group B.V., and absent the anticompetitive conduct described above, have competing interests to each achieve the maximum returns on their respective investments in Selecta Group B.V.

137. Upon information and belief, absent the Cooperation Agreement, none of the Favored Holders individually had sufficient holdings or voting power under the Intercreditor Agreement to direct the Security Agent to engage in a foreclosure that ultimately transferred all shares in Selecta Group B.V. to Bidco, which is controlled exclusively by the Favored Holders. Upon information and belief, absent the Cooperation Agreement, none of the Favored Holders

individually had sufficient holdings or voting power under the Intercreditor Agreement to force an artificial devaluation of Plaintiffs' and the other Excluded Holders' debt instruments.

138. Upon information and belief, the Cooperation Agreement and other anticompetitive collusive agreements entered into between the Favored Holders represent a *per se* unlawful contract, combination, and/or conspiracy within the meaning of Section 1 of the Sherman Act.

139. Upon information and belief, through the Cooperation Agreement, and other anticompetitive collusive agreements, the Favored Holders agreed to artificially suppress the value of Plaintiffs' holdings, which constitutes a *per se* unlawful price fixing conspiracy under Section 1 of the Sherman Act.

140. Upon information and belief, through the Cooperation Agreement, and other anticompetitive collusive agreements, the Favored Holders agreed to collectively vote against the interests of Plaintiffs, and all other Excluded Holders, and unlawfully colluded with one another to artificially devalue the interests of the Excluded Holders and capture for themselves returns that would otherwise have been spread across all holders. Such conduct constitutes a *per se* unlawful group boycott under Section 1 of the Sherman Act.

141. In the alternative, the Favored Holders are liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics would conclude the conduct in question would have an anticompetitive effect on Plaintiffs and all Excluded Holders.

142. The Favored Holders perpetuated their scheme with the specific intent to artificially devalue Plaintiffs' and the other Excluded Holders' debt instruments.

143. Upon information and belief, as a direct and proximate result of the Favored Holders' violations of Section 1 of the Sherman Act, Plaintiffs have suffered and will continue to suffer injury and damages to their business and property of the type the federal antitrust laws were

designed to prevent, and such injury flows directly from that which makes the Favored Holders' conduct unlawful. These damages include the diminishment and/or elimination of the value of Plaintiffs' notes, statutory treble damages, costs, attorneys' fees, and interest.

**COUNT TWO**
**(Unlawful Restraints of Trade, Rule of Reason Violations – Pursuant to 15 U.S.C. §§ 1 and 15 – by the Favored Holders, Selecta Group AG, and Selecta Group B.V.)**

144. Plaintiffs incorporate by reference Paragraphs 1 through 143 of the Complaint as if set forth fully herein.

145. Plaintiffs bring this claim under Section 1 of the Sherman Act and Section 4 of the Clayton Act, 15 U.S.C. §§ 1 and 15, for statutory treble damages, costs, attorneys' fees, and interest.

146. Upon information and belief, the Favored Holders, along with Selecta Group AG and Selecta Group B.V. entered into an unlawful agreement to restrain trade in the market for Selecta Group B.V.'s first lien debt, in which Favored Holders and Excluded Holders, including Plaintiffs, are the only competitors.

147. Upon information and belief, absent the Favored Holders, Selecta Group AG, and Selecta Group B.V.'s anticompetitive agreements, the value of the Favored Holders' and the Excluded Holders' respective notes would have been determined solely by market conditions.

148. Upon information and belief, the Favored Holders, Selecta Group AG, and Selecta Group B.V. unlawfully colluded with one another in directing the Security Agent to engage in a foreclosure based on misleading information and material omissions, which ultimately transferred all Selecta Group B.V. shares to Bidco, which is controlled exclusively by the Favored Holders, depriving the Excluded Holders of valuable collateral, guarantees, and other rights.

149. Upon information and belief, the Restructuring unreasonably allowed the Favored Holders to restructure the Selecta Group B.V. debt under Bidco and artificially devalue the debt of the Excluded Holders, including Plaintiffs, which effectively allowed the Favored Holders to materially, if not wholly, consolidate the total value of the Selecta Group B.V. 1L Notes among themselves to the exclusion of the Excluded Holders.

150. Upon information and belief, the anticompetitive collusive agreements entered between the Favored Holders, Selecta Group AG, and Selecta Group B.V. represent an unreasonable contract, combination, and/or conspiracy within the meaning of Section 1 of the Sherman Act under the "rule of reason" in the alternative should the Court conclude the *per se* standard of review does not apply.

151. Upon information and belief, the diminution and/or elimination of value of Plaintiffs' notes is a direct and proximate result of the Favored Holders', Selecta Group AG's, and Selecta Group B.V.'s violations of Section 1 of the Sherman Act under the "rule of reason" in the alternative should the Court conclude the *per se* standard of review does not apply.

152. The Favored Holders, Selecta Group AG and Selecta Group B.V. perpetuated their scheme with the specific intent to artificially devalue Plaintiffs' and the other Excluded Holders' debt instruments.

153. Upon information and belief, Plaintiffs have suffered and will continue to suffer injury and damages to their business and property of the type that the federal antitrust laws were designed to prevent, and such injury flows directly from that which makes the conduct of the Favored Holders, Selecta Group AG, and Selecta Group B.V. unlawful. These damages include the diminishment and/or elimination of the value of Plaintiffs' notes (effectively foreclosing the

market for Selecta Group B.V. notes to every Selecta Group B.V. creditor that is not a Favored Holder), statutory treble damages, costs, attorneys' fees, and interest.

**COUNT THREE**
**(Unlawful Restraints of Trade, Per Se Violation –**
**Pursuant to New York General Business Law § 340 by the Favored Holders)**

154. Plaintiffs incorporate by reference Paragraphs 1 through 153 of the Complaint as if set forth fully herein.

155. Plaintiffs bring this claim under Section 340 of the New York General Business Law ("Donnelly Act") for treble damages, costs, attorneys' fees, and interest.

156. Upon information and belief, the Favored Holders all are creditors of Selecta Group B.V., and absent the anticompetitive conduct described above, have competing interests to each achieve the maximum returns on their respective investments in Selecta Group B.V.

157. Upon information and belief, absent the Cooperation Agreement, none of the Favored Holders individually had sufficient holdings or voting power under the Intercreditor Agreement to direct the Security Agent to engage in a foreclosure that ultimately transferred all Selecta Group B.V. shares to Bidco, which is controlled exclusively by the Favored Holders. Upon information and belief, absent the Cooperation Agreement, and other anticompetitive collusive agreements, none of the Favored Holders individually had sufficient holdings or voting power under the Intercreditor Agreement to take the steps which resulted in an artificial devaluation of Plaintiffs' debt instruments.

158. Upon information and belief, the Cooperation Agreement, and other anticompetitive collusive agreements entered into between the Favored Holders represent a *per se* unlawful contract, agreement, arrangement or combination within the meaning of the Donnelly Act.

159. Upon information and belief, through the Cooperation Agreement, and other anticompetitive collusive agreements, the Favored Holders agreed to artificially suppress the value of Plaintiffs' holdings of Selecta Group B.V. debt, which constitutes a *per se* unlawful price fixing conspiracy under the Donnelly Act.

160. Upon information and belief, in addition, through the Cooperation Agreement, and other anticompetitive collusive agreements, the Favored Holders agreed to collectively vote against the interests of the Excluded Holders, including Plaintiffs, and unlawfully colluded with one another to artificially devalue the interests of the Excluded Holders and capture for themselves returns that would otherwise have been spread across all holders. Such conduct constitutes a *per se* unlawful group boycott under the Donnelly Act.

161. In the alternative, the Favored Holders are liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics would conclude that the conduct in question would have an anticompetitive effect on Plaintiffs and the Excluded Holders.

162. The Favored Holders perpetuated their scheme with the specific intent to artificially devalue Plaintiffs' and the other Excluded Holders' debt instruments.

163. Upon information and belief, as a direct and proximate result of the Favored Holders' violations of the Donnelly Act, Plaintiffs have suffered and will continue to suffer injury and damages to their business and property of the type the New York state antitrust laws were designed to prevent, and such injury flows directly from that which makes the Favored Holders' conduct unlawful. These damages include the diminishment and/or elimination of the value of Plaintiffs' notes, treble damages, costs, attorneys' fees, and interest.

**COUNT FOUR**
**(Unlawful Restraints of Trade, Rule of Reason Violations – Pursuant to New York General Business Law § 340 by the Favored Holders, Selecta Group B.V., and Selecta Group AG)**

164. Plaintiffs incorporate by reference Paragraphs 1 through 163 of the Complaint as if set forth fully herein.

165. Plaintiffs bring this claim under the Donnelly Act for treble damages, costs, attorneys' fees, and interest.

166. Upon information and belief, the Favored Holders, along with Selecta Group AG, and Selecta Group B.V., entered into an unlawful agreement to restrain trade in the market for Selecta Group B.V.'s first lien debt, in which the Favored Holders and the Excluded Holders, including Plaintiffs, are the only competitors.

167. Upon information and belief, absent the Favored Holders, Selecta Group AG, and Selecta Group B.V.'s anticompetitive agreements, the value of holders' respective notes would have been determined solely by market conditions.

168. Upon information and belief, the Favored Holders, Selecta Group AG, and Selecta Group B.V. unlawfully colluded with one another to direct the Security Agent to engage in a foreclosure based on misleading information and material omissions that ultimately transferred all Selecta Group B.V. shares to Bidco, which is controlled exclusively by the Favored Holders, depriving the Excluded Holders of valuable collateral, guarantees, and other rights.

169. Upon information and belief, the Restructuring unreasonably allowed the Favored Holders to restructure the Selecta Group B.V. debt under Bidco and artificially devalue the debt of the Excluded Holders, including Plaintiffs, which effectively allowed the Favored Holders to materially, if not wholly, consolidate the total value of the Selecta Group B.V. 1L Notes among themselves to the exclusion of the Excluded Holders.

170. Upon information and belief, the anticompetitive collusive agreements entered between the Favored Holders, Selecta Group AG, and Selecta Group B.V. represent an unreasonable contract, agreement, arrangement or combination within the meaning of the Donnelly Act under the "rule of reason" in the alternative should the court conclude the *per se* standard of review does not apply.

171. Upon information and belief, the diminution and/or elimination of value of Plaintiffs' notes are a direct and proximate result of the Favored Holders, Selecta Group AG, and Selecta Group B.V.'s violations of the Donnelly Act under the "rule of reason" in the alternative should the court conclude the *per se* standard of review does not apply.

172. The Favored Holders, Selecta Group AG, and Selecta Group B.V. perpetuated their scheme with the specific intent to artificially devalue Plaintiffs' and the other Excluded Holders' debt instruments.

173. Upon information and belief, Plaintiffs have suffered and will continue to suffer injury and damages to their business and property of the type that the New York state antitrust laws were designed to prevent, and such injury flows directly from that which makes the conduct of the Favored Holders, Selecta Group AG, and Selecta Group B.V. unlawful. These damages include the diminishment and/or elimination of the value of Plaintiffs' notes (effectively foreclosing the market for Selecta Group B.V. notes to every Selecta Group B.V. creditor that is not a Favored Holder), treble damages, costs attorneys' fees, and interest.

**COUNT FIVE**
**(Breach of 1L Indenture against Selecta Group B.V.)**

174. Plaintiffs incorporate by reference Paragraphs 1 through 173 of the Complaint as if set forth fully herein.

175. The terms of the 1L Notes and 1L Indenture were at all relevant times valid and enforceable contract obligations of Selecta Group B.V. to Plaintiffs.

176. Section 4.01 of the 1L Indenture entitles Plaintiffs and other holders of the 1L Notes to payment of principal and interest in cash "on the dates and in the manner provided in the Notes and this Indenture." 1L Indenture § 4.01.

177. The euro-denominated 1L Notes require payments to be made in euros, *see* Back of Euro Note at A-2-6, while the Swiss franc-denominated 1L Notes require payments to be made in Swiss francs, *see* Back of CHF Note at A-2-6. Section 14.13 further clarifies that "[t]he currency in which any series of Notes hereunder is issued . . . is the sole currency of account and payment for all sums payable by the Issuer and the Guarantors . . . ." 1L Indenture § 14.13.

178. Section 6.02 of the 1L Indenture entitles Plaintiffs and other holders of the 1L Notes to immediate payment of principal, premium, and accrued and unpaid interest upon acceleration of the 1L Notes. 1L Indenture § 6.02.

179. Under Section 6.04 of the 1L Indenture, a payment default can only be waived if holders of at least 90% of the aggregate principal amount of the outstanding Notes consent. 1L Indenture § 6.04. And under Section 9.02 of the 1L Indenture, 90% consent is required for an amendment or waiver of the 1L Indenture that reduces the principal or interest due, changes the maturity date, makes the Notes payable in a currency other than the currency stated in the Notes, or "impair[s] the contractual right of any Holder to institute suit for the enforcement of any payment of principal of, or interest." 1L Indenture § 9.02.

180. To the extent the Trustee or Security Agent collects any money from the enforcement of a Security Document (as defined in the 1L Indenture, including the enforcement

of a share pledge), that money is to be paid out to Holders "ratably, without preference or priority of any kind." 1L Indenture § 6.10.

181. Additionally, Section 10.06(a) provides that the Security Agent is required to act "for the benefit of ***all*** holders of secured obligations." (emphasis added).

182. Here, Selecta Group B.V. failed to make an interest payment due to holders of the 1L Notes on January 2, 2025. Consent of holder of 90% or more of the 1L Notes was never given, so no waiver or amendment ever obviated this breach.

183. After Selecta Group B.V. notified the 1L Trustee that an Event of Default had occurred on April 30, 2025, the 1L Notes were accelerated, making the notes immediately due in full including the outstanding principal amount of the 1L Notes and any accrued and unpaid interest plus any redemption premium owed. *Id.* § 6.02.

184. No cash payment was made to 1L Holders after the acceleration, including but not limited to Plaintiffs and other Excluded Holders.

185. The Security Agent acted primarily for the benefit of the Favored Holders (not "all" 1L Holders), and thus Selecta Group B.V. violated Section 10.06(a) of the 1L Indenture as well.

186. The Excluded Holders also did not receive the same consideration for their 1L Notes as the Favored Holders received, a clear violation of Section 6.10 of the 1L Indenture. As a result of the Cooperation Agreements, the Seagull Indemnity, the foreclosure by private sale of the Selecta Group B.V. equity to a party controlled by the Favored Holders, a coercive Exchange Offer, and other factors, the distributions made to the Favored Holders comprised a substantially different package of rights, interests, and securities—with a substantially higher value—than the consideration made available to the Excluded Holders for their 1L Notes.

187. In sum, Selecta Group B.V. violated the terms of the 1L Indenture in multiple ways. First, instead of paying 1L Holders the principal or interest they were owed under the 1L Notes, Selecta Group B.V. instead attempted to make payment in new debt securities (something not contemplated under the 1L Indenture). Second, Selecta Group B.V. did not make a "ratable" distribution of proceeds to the 1L Holders, instead issuing subordinated (i.e., "third out") securities that only ***some*** of the 1L Holders (the Favored Holders) could safely exchange for 1O Notes (because of the elimination of the 90% consent requirement in the 1O Indenture and the Cooperation Agreement). Third, Selecta Group B.V. failed to obtain approval from 90% of holders to effectuate changes in the payment terms, as required by Sections 6.04 and 9.02 of the 1L Indenture. Fourth, the Security Agent acted primarily for the benefit of the Favored Holders (not "all" 1L Holders), and thus Selecta Group B.V. violated Section 10.06(a) of the 1L Indenture.

188. The Intercreditor Agreement could not override the requirements of the 1L Indenture breached by Selecta Group B.V. First, because the actions described herein presented a material risk of liability for members of the Selecta Group and/or their respective directors or officers, and gave rise to a material risk of breach of fiduciary or statutory duties the Intercreditor Agreement did not override the explicit terms of the 1L Indenture. Intercreditor Agreement Clause 1.2(z). Additionally, Clause 15.1(d) of the Intercreditor Agreement requires that amounts recovered or received by the Security Agent must be applied to pay the 1L Holders in accordance with the terms of the 1L Indenture. That means that under both the terms of the Intercreditor Agreement and the 1L Indenture, the 1L Trustee needed to comply with the 1L Indenture's requirement to ratably distribute Distressed Disposal proceeds. Moreover, nothing in the Intercreditor Agreement purported to override the 1L Indenture's requirement that the Security Agent is required to act "for the benefit of ***all*** holders of secured obligations." 1L Indenture § 10.06

(emphasis added). Therefore, the Intercreditor Agreement did not operate to excuse Selecta Group B.V.'s breaches of the 1L Indenture.

189. Plaintiffs have suffered substantial actual and prospective damages in an amount to be determined at trial, in an amount equal to the principal of and accrued and unpaid interest on the 1L Notes including pre- and post-judgment interest calculated pursuant to the terms of the 1L Notes and 1L Indenture and attorneys' fees, costs and expenses pursuant to Section 6.11 of the 1L Indenture.

**COUNT SIX**
**(Breach of 1L Indenture § 11.01 Guarantees against the Guarantors)**

190. Plaintiffs incorporate by reference Paragraphs 1 through 189 of the Complaint as if set forth fully herein.

191. Upon information and relief, the Guarantees were at all relevant times valid and enforceable contractual obligations of the Guarantors to Plaintiffs.

192. Pursuant to the terms of the 1L Indenture, the Guarantors agreed to provide an unconditional guarantee of principal, premium, interest and other amounts due and owing under the Notes. 1L Indenture § 11.01(a).

193. There are no provisions in the Guarantees that provide for the release of the Guarantees pursuant to consent of a limited number of holders. Rather, the 1L Indenture provides that each Guarantor hereby agrees that its obligations thereunder shall be unconditional, irrespective of "the validity, regularity or enforceability" of the 1L Notes or 1L Indenture or "any waiver or consent by any [1L Holder]." 1L Indenture § 11.01(b).

194. The Intercreditor Agreement could not override the Guarantors' obligation to provide an unconditional guarantee of principal, premium, interest and other amounts due and owing under the Notes in relevant part because the actions described herein presented a material

risk of liability for members of the Selecta Group and/or their respective directors or officers, and gave rise to a material risk of breach of fiduciary or statutory duties. Intercreditor Agreement Clause 1.2(z). Clause 15.1(d) of the Intercreditor Agreement further requires that amounts recovered or received by the Security Agent must be applied to pay the 1L Holders in accordance with the terms of the 1L Indenture. That means that under both the terms of the Intercreditor Agreement and the 1L Indenture, the 1L Trustee needed to comply with the 1L Indenture's requirement to ratably distribute Distressed Disposal proceeds. Additionally, nothing in the Intercreditor Agreement purported to override the 1L Indenture's requirement that the Security Agent is required to act "for the benefit of ***all*** holders of secured obligations." 1L Indenture § 10.06 (emphasis added). Therefore, the Intercreditor Agreement did not operate to excuse the Guarantors' obligation under the 1L Indenture.

195. Any purported release of the Guarantees through the Restructuring is a breach of the terms of the 1L Indenture.

196. Plaintiffs have suffered substantial actual and prospective damages in an amount to be determined at trial, in an amount equal to the principal of and accrued and unpaid interest on the 1L Notes including pre- and post-judgment interest calculated pursuant to the terms of the 1L Notes and 1L Indenture and attorneys' fees, costs and expenses pursuant to Section 6.11 of the 1L Indenture.

## COUNT SEVEN
## (Breach of the Duty of Good Faith and Fair Dealing against Selecta Group B.V.)

197. Plaintiffs incorporate by reference Paragraphs 1 through 196 of the Complaint as if set forth fully herein.

198. The terms of the 1L Indenture and 1L Notes were at all times herein valid and enforceable contract obligations of Selecta Group B.V. to Plaintiffs.

199. New York law implies in every contract a covenant requiring each party to deal fairly and in good faith with the other and to refrain from taking any actions that would deprive the other party of the benefit of their respective bargain.

200. Plaintiffs performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the 1L Indenture and the 1L Notes.

201. Selecta Group B.V. breached the covenant of good faith and fair dealing by engaging in a course of conduct outside of performance of the contract, including, upon information and belief, entering into agreements, including the Framework Agreement, the Share Purchase Agreement, and certain amendments to its existing debt documents, that sought to accomplish certain outcomes Selecta Group B.V. would never have been able to achieve had it followed the terms of the 1L Indenture and the 1L Notes, and, upon information and belief, providing assurances prior to the Restructuring that it would accede to the Seagull Indemnity at a later date, to try to get around the fact that an indemnity on such terms was prohibited at the time by the terms of the Intercreditor Agreement.

202. Specifically, Selecta Group B.V. violated the implied covenant of good faith and fair dealing by, on information and belief:

(a) Entering into a non-public Framework Agreement, Share Purchase Agreement, and possibly other agreements with certain Favored Holders to sell the shares of Selecta Group B.V. and transfer the debt of Selecta Group B.V. to Bidco, an entity controlled by the Favored Holders, thus enabling the Favored Holders to appropriate almost complete control over Bidco and its 1O Notes while destroying the value of the notes held by the Excluded Holders;

(b) Refusing to engage with all interested holders, including Plaintiffs;

(c) Refusing to allow the benefits of the transactions to be made available to all holders equally when the consent of 90% of holders was required to undertake the transaction;

(d) Colluding with a select group of 1L Holders to strip the Excluded Holders of their rights and the value of their 1L Notes; and

(e) On information and belief, failing to disclose or misrepresenting the terms of the Restructuring to the NCC in connection with the Dutch Proceeding.

203. Selecta Group B.V.'s aggregate course of dealing outside of the provisions and protections of the 1L Indenture, and actions to strip Plaintiffs and the Excluded Holders of protections and rights they were afforded under the 1L Indenture and related documents through a course of conduct constituting bad faith, deprived Plaintiffs of the benefit of their bargain under the 1L Indenture.

204. Plaintiffs have suffered substantial actual and prospective damages in an amount to be determined at trial, in an amount equal to the principal of and accrued and unpaid interest on the 1L Notes including pre- and post-judgment interest calculated pursuant to the terms of the 1L Notes and 1L Indenture and attorneys' fees, costs and expenses pursuant to Section 6.11 of the 1L Indenture.

## COUNT EIGHT
## (Breach of the Minority Protection Principle against the Favored Holders under English Law)

205. Plaintiffs incorporate by reference Paragraphs 1 through 204 of the Complaint as if set forth fully herein.

206. Plaintiffs intend to raise and rely upon issues of English law to establish their claim in respect of a breach of the English law minority protection principle.

207. The Favored Holders appear to have relied on their capacities as Majority Senior Secured Creditors under the Intercreditor Agreement to exercise a majority power to instruct the Security Agent to enforce the Share Pledge.

208. Under English law, there are certain general and longstanding principles of ancient origin which apply in relation to the construction and exercise of powers conferred upon a majority to bind a minority within a class.

209. In particular, the exercise of a contractual power by a majority within a class of noteholders to bind a minority of noteholders who form part of that same class is subject to an overriding principle that such power be exercised bona fide in the best interests of the class of noteholders as a whole, and not in a manner which is oppressive or unfair to the minority (the "Minority Protection Principle").

210. Accordingly, the exercise of the majority power by the Favored Holders to instruct the Security Agent to enforce the Share Pledge had to be undertaken in good faith for the purpose for which it was conferred, and without an outcome which was oppressive or unfair to the minority.

211. The power to instruct the Security Agent to enforce the Transaction Security sits within the wider provisions of the Intercreditor Agreement relating to Distressed Disposals and the application of Disposal Proceeds. Those provisions are fundamentally and intrinsically linked, such that any instruction to enforce security, the associated consequences of that enforcement, and the ultimate outcome of that enforcement, must be viewed as one process.

212. Upon information and belief, the enforcement of the Share Pledge was an essential step in a series of connected and inter-conditional transactions pursuant to the Framework

Agreement which together comprised the Restructuring and without which the Restructuring could not have occurred.

213. The purpose of the exercise of a majority right to enforce security by a majority of the holders of the 1L Notes should have been to mitigate loss and/or protect value for ***all*** holders of 1L Notes.

214. By the exercise of their majority power the Favored Holders procured an outcome which did not mitigate loss and/or protect value for ***all*** holders of 1L Notes. On the contrary, the outcome was wholly oppressive and unfair to the Excluded Holders, in that the Favored Holders ultimately received 3O Notes which were all exchanged (upon information and belief, as a pre-agreed step in the Restructuring) for 1O Notes which trade at about 75 cents on the euro and the Excluded Holders ultimately received 3O Notes which could only be exchanged for 1O Notes that effectively have different rights and are effectively different securities, and therefore trade at about 15-20 cents on the euro. In addition, the Favored Holders conspired to obtain indemnification rights from the issuer of the 1O and 3O Notes (Bidco) that were not conferred on the Excluded Holders.

215. Upon information and belief, there was no legitimate justification for the 1O Notes not to reflect the contractual minority protection provisions which the 1L Notes contained and the 3O Notes contain, nor to block the Excluded Holders from enjoying the benefit of the Cooperation Agreement and Seagull Indemnity which the Favored Holders enjoy, other than to ensure the Favored Holders benefited economically at the expense of the Excluded Holders.

216. The Favored Holders exercised a majority right in their own interests and not in the interests of the holders of the 1L Notes as a whole and, upon information and belief, for no justification other than the extraction of value from the Excluded Holders by and for the benefit of

the Favored Holders. The outcome of the exercise of the majority right by the Favored Holders was clearly oppressive and unfair to the minority Excluded Holders and the Favored Holders therefore breached the Minority Protection Principle and are liable for the loss suffered by the Excluded Holders.

217. Plaintiffs have suffered substantial actual and prospective damages in an amount to be determined at trial, but not less than an amount equal to the principal of and accrued and unpaid interest on the 1L Notes as well as the difference between the value that the Favored Holders are able to obtain for their 1O Notes as opposed to the market value of the 3O Notes.

**COUNT NINE**
**(Tortious Interference with Contract against the Favored Holders)**

218. Plaintiffs incorporate by reference Paragraphs 1 through 217 of the Complaint as if set forth fully herein.

219. The terms of the 1L Notes and 1L Indenture were at all times herein valid and enforceable contract obligations of Selecta Group B.V. and the Guarantors to Plaintiffs and the other 1L Holders.

220. Upon information and belief, the Favored Holders were aware of the 1L Indenture and the obligations of Selecta Group B.V. and the Guarantors to 1L Holders thereunder.

221. On information and belief, the Favored Holders intentionally induced Selecta Group B.V. and the Guarantors to breach the 1L Indenture, almost entirely destroying the Excluded Holders' rights under the 1L Indenture and the value of the 1L Notes held by the Excluded Holders, and in doing so violated federal and state antitrust laws.

222. On information and belief, this strategy (referred to by market watchers as "creditor-on-creditor violence"[31]) was an integral part of Defendants' scheme—for only by depriving the Excluded Holders of their rights to share proportionately in the benefits of the Restructuring could the Favored Holder enhance the value of their investment position.

223. On information and belief, the Favored Holders intentionally induced Selecta Group B.V., the Guarantors, and the Selecta Group more broadly to enter into the Restructuring, which made performance under the 1L Notes impossible and failed to provide a material benefit to Selecta Group B.V.

224. The Favored Holders' conduct constituted a violation of the U.S. antitrust laws, and was thus illegal.

225. But for the Favored Holders' actions, Selecta Group B.V. would not have breached the 1L Indenture by failing to pay the principal or interest due under the 1L Notes, attempting to make payment in new debt securities as opposed to cash, failing to make a ratable distribution of the new debt securities, and failing to obtain approval from 90% of holders to effectuate changes to the holders' sacred rights including payment and maturity date. Moreover, but for the Favored Holders' actions, the Guarantors would not have breached their obligations under the 1L Indenture.

226. As a result of Selecta Group B.V.'s breach, Plaintiffs have suffered substantial actual and prospective damages in an amount to be determined at trial, but not less than an amount equal to the principal of and accrued and unpaid interest on their 1L Notes.

---

[31] *See* Jean-Marc Poilpré, *Distressed Debt: Hunkemoller offers Europe taste of creditor-on-creditor violence'*, PITCHBOOK (Jan. 20, 2025), https://pitchbook.com/news/articles/hunkemoller-offers-europe-taste-of-lender-on-lender-violence.

**COUNT TEN**
**(Breach of Fiduciary Duty against the Directors of Selecta Group B.V. under Dutch Law)**

227. Plaintiffs incorporate by reference Paragraphs 1 through 226 of the Complaint as if set forth fully herein.

228. Plaintiffs intend to raise and rely upon issues of Dutch law to establish their breach of fiduciary duty law claim.

229. Upon information and belief, the Directors of Selecta Group B.V., a Dutch company, were aware of the 1L Indenture and the obligations of Selecta Group B.V. and the Guarantors to 1L Holders thereunder, and that those obligations were owed pari passu to each 1L Holder.

230. Under Dutch law, the duty of care of directors of Dutch companies increasingly shifts towards the interests of the company's creditors as a whole once a company is in the "zone of insolvency" and it is clear the company may not be able to meet its obligations.

231. Directors of Dutch companies also have personal tort liability towards creditors where personal sufficiently serious blame can be attributed to the directors for harm caused to individual creditors.

232. In particular, where the directors have caused or permitted a creditor's claim to remain unpaid and unrecoverable without providing sufficient recourse, personal sufficiently serious blame (*persoonlijk voldoende ernstig verwijt)* is attributed to those directors such that they are liable for the creditor's loss.

233. Upon information and belief, Selecta Group B.V. was in the "zone of insolvency" prior to the Restructuring.

234. Upon information and belief, the Restructuring was a collaborative transaction in which the directors of Selecta Group B.V. proactively agreed with the Favored Holders to the exclusion, and to the detriment, of the Excluded Holders by, inter alia:

(a) beginning to work with the Favored Holders as early as December 2024, including signing an initial cooperation agreement;

(b) entering into a binding agreement for a "comprehensive recapitalization" which Selecta Group B.V. announced it had agreed to the market;

(c) completing and implementing a transaction which Selecta Group B.V. announced had been "negotiated and agreed with creditors;" and

(d) not only making no effort to take steps to protect the creditor interests of the Excluded Holders or ensure they were treated the same as the Favored Holders throughout, but also deliberately concealing information from the Excluded Holders.

235. By colluding with the Favored Holders to devise and implement a Restructuring which benefits the Favored Holders at the expense of the Excluded Holders (including, upon information and belief, by agreeing to accede to, or giving assurances prior to the closing of the Restructuring that it would accede to, the Seagull Indemnity—a breach of the Intercreditor Agreement), and without taking into account the interests of the Excluded Holders when Selecta Group B.V. was in the zone of insolvency (including by incurring a further significant contingent liability by granting the Company Indemnity at a time when Selecta Group B.V. was unable to pay its debts), the directors of Selecta Group B.V. are personally sufficiently seriously to blame such that they are personally liable for the loss suffered by the Excluded Holders.

236. Plaintiffs have suffered substantial actual and prospective damages in an amount to be determined at trial, but not less than an amount equal to the principal of and accrued and unpaid interest on the 1L Notes as well as the heightened value that the Favored Holders are able to obtain for their 1O Notes as opposed to the market value of the 3O Notes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants and enter an order:

(a) Awarding Plaintiffs damages in an amount to be determined at trial, but not less than an amount equal to the principal of and accrued, unpaid interest on their 1L Notes;

(b) Awarding Plaintiffs statutory treble damages;

(c) Awarding Plaintiffs pre- and post-judgment interest calculated pursuant to the terms of the 1L Notes and 1L Indenture;

(d) Awarding Plaintiffs their attorneys' fees, costs and expenses incurred in bringing this action pursuant to Section 6.11 of the 1L Indenture; and

(e) Awarding such other and further relief as this Court may deem proper.

Plaintiffs hereby demand a trial by jury.

Dated: December 5, 2025
New York, New York

**FAEGRE DRINKER BIDDLE & REATH LLP**

By: */s/James H. Millar*
James H. Millar
Clay J. Pierce

1177 Avenue of the Americas
43rd Floor
New York, New York 10036
Telephone: (212) 248-3140

-and-

Kathy Osborn (admitted pro hac vice)
Anna Marie Behrmann (admitted pro hac vice)
300 N. Meridian Street, Ste. 2500
Indianapolis, Indiana 46204
Telephone: (317) 237-0300

-and-

Julie R. Landy (pro hac vice forthcoming)
Paige A. Naig (pro hac vice forthcoming)
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, Minnesota 55402
Telephone: (612) 766-7000

*Attorneys for Deltroit Directional Opportunities Master Fund Limited, Algebris UCITS Funds P.L.C., Fineco Asset Management DAC, CQS Credit Multi Asset Fund, CQS Brunel Multi Asset Credit Fund, CQS Alternative Credit Fund, CQS New City High Yield Fund Limited, Mercer Multi-Asset Credit Fund, and Faros Point Credit Opportunities Limited*